## OLMSTEAD ET AL. *v.* UNITED STATES

## GREEN ET AL. *v.* SAME.

## McINNIS *v.* SAME.

Nos. 493, 532 and 533. Argued February 20, 21, 1928.—Decided June 4, 1928.

*Mr. John F. Dore,* with whom *Messrs. F. C. Reagan* and *J. L. Finch* were on the brief, for petitioners in No. 493.

The principles controlling this case were first announced by this Court in *Boyd* v. *United States,* 116 U. S. 616. They have never been deviated from, but have been reiterated again and again in a series of cases, the last of which is *Byars* v. *United States,* 273 U. S. 28. See also *Gouled* v. *United States,* 255 U. S. 298.

If incriminating evidence is secured by means of trickery, subterfuge, trespass or fraud, and, after it has been so secured, finds its way into the hands of government officials, no legal ground can be urged against its introduction in evidence, for the reason that no constitutional question

is involved. If, however, the fraud, subterfuge, trespass or theft is perpetrated by government officials, or if a government official participates directly or indirectly therein, the evidence thus secured is not admissible for the reason that it was secured in a manner which violates the provisions of the Fourth and Fifth Amendments to the Constitution. *Byars* v. *United States, supra; United States* v. *Mandel,* 17 F. (2d) 270; *Rudkin,* J., in case at bar, dissenting opinion.

The *Boyd* case lays down search and seizure law, and nothing but search and seizure law, but it involved neither a search nor a seizure.

*Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, was ruled by application of the Fourth Amendment, but it was not a search and seizure case either. Upon appeal to this Court, it was held that the proceedings were an attempt to do indirectly what the Government could not do directly.

*Gouled* v. *United States, supra,* did not involve a search and seizure as these words are employed in legal parlance, but the case was ruled by search and seizure law and application of the Fourth and Fifth Amendments.

It is not necessary that the act complained of be strictly a search or seizure, if its effect be to compel a man to furnish the evidence to convict himself of crime, and the act be one of governmental agency. See *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365.

These principles apply to " all invasions on the privacies of life." No exact definition of this term has been found, but obviously it is a comprehensive term and surely includes the right to be let alone.

The right to the exclusive enjoyment of a telephone free of interference from anybody, is a right of privacy. No government agent has a right to interpose an earpiece upon it any more than he has a right to raise the curtain and peek through another's window. If two persons are

conversing in a room of one of them, an intrusion therein by a government agent secretly is an intrusion upon their right of privacy. Is it any the less so if they are in separate rooms connected by a telephone and some interloper " listens in " by means of " tapping " the wire? Such conduct constitutes an invasion of the privacies of life, and when done by a government agent, falls within the condemnation of the *Boyd* case; and evidence thereby secured is inadmissible for the purpose of securing a conviction in a criminal case.

*Mr. Frank R. Jeffery,* for petitioner in No. 533, and some of the petitioners in No. 532.

This Court has held that the Fourth and Fifth Amendments were inspired by the same abuses, preceding the adoption of the Constitution, and they must be liberally construed in favor of the citizen and his liberty, and that stealthy encroachments upon the rights guaranteed by them will not be tolerated. *Boyd* v. *United States,* 116 U. S. 616.

The majority opinion of the Circuit Court of Appeals for the Ninth Circuit places a narrow construction upon the rights protected by these Amendments, declaring that "the purpose of the Amendments is to prevent the invasion of homes and offices and seizure of incriminating evidence found therein."

The majority opinion concedes that the tapping of the defendants' telephone wires is an "unethical intrusion on the privacies of persons who are suspected of crime," but holds that "it is not an act which comes within the letter of the prohibition of constitutional provisions."

These declarations of the Circuit Court of Appeals are directly contrary to the holdings of this Court. In *Ex parte Jackson,* 96 U. S. 727, this Court did not limit the application of the Amendments to the " invasion of homes and offices." Neither has this Court limited the applica-

tion of these Amendments to the "letter" of the same. On the contrary, the underlying thought in each decision of this Court affecting these Amendments has been to apply the "spirit" of them. In the *Boyd* case this Court declares that these principles "apply to all invasions on the part of the Government and its employees of the security of a man's home and the privacies of life." In that case no search and seizure were involved, if the words "search and seizure" be given their literal meaning. The Court in its decision admitted, in effect, that no actual search and no actual seizure were involved, but held that the result was the same as if an actual search and an actual seizure were made.

It definitely established that it is not the mere form and substance of the acts of government agents which determine whether the search and seizure are in violation of the constitutional provisions, but it is the results accomplished by such acts. If such acts "effect the sole object and purpose of search and seizure," then they come within the inhibition of the Fourth and Fifth Amendments.

In the case at bar, the sole object of the government agents was to obtain evidence relating to transactions in liquor by the defendants. The conversations heard over the telephone were of evidential value only. It is no crime to exchange messages relating to the possession and sale of liquor. The crime is to possess and sell liquor, and conversations concerning the possession or sale are only admissible when the liquor which is possessed or sold is seized. Suppose that the messages relating to the possession and sale of the liquor had been sent by letter. No warrant to search the homes, offices or persons of the defendants for such letter could have been obtained. *Gouled* v. *United States*, 255 U. S. 298. Likewise, no valid search warrant could be obtained by government agents to tap the telephone lines of the defendants for

the purpose of securing evidence of the private messages and conversations relating to the possession or sale of liquor.

Furthermore, the admission of the evidence of government agents as to the messages transmitted over the telephone wires compelled the defendants to give evidence against themselves just as effectively as if they had been forced to take the witness stand and themselves testify as to the messages sent over the telephone; yea, just as effectively as if the defendants had been required to produce in court private messages sent by letter of exactly the same import as the messages sent by 'phone. The result is to compel the defendants to become the unwilling source of evidence to convict them of crime, which this Court in the *Boyd* case held to be a violation of the defendants' right under the Fifth Amendment.

It would indeed be difficult to attempt to enumerate all of those things coming within the phrase "the privacies of life," but it would be equally difficult to suggest any more sacred or any greater privacy of life under present conditions than that of using a private telephone line for transmitting private and confidential communications to one's family and business associates. What greater invasion of this privacy of life could be contemplated than to have one's private and confidential communications intercepted and overheard by promiscuous government agents by means of secretly tapping one's telephone? The telephone as a means of communication was not known to the world at the time of Lord Camden's judgment, or at the time of the adoption of the Fourth and Fifth Amendments, or even at the time of the decision of this Court in the *Boyd* case. The only means of communication at that time was by letter, and the right to transmit a secret message in a letter without having it intercepted and read by government agents was de-

clared by this Court in no uncertain language in the case of *Ex parte Jackson,* 96 U. S. 727.

It is not the paper which is protected by the constitutional inhibitions, but it is the message contained in the letter. In the same manner, any message transmitted by telephone or telegraph should be protected. The interpretation of the language of the Amendments should be sufficiently liberal and elastic to apply the principles laid down in the *Boyd* case to the conditions of to-day. That this is the true criterion is declared by this Court in *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365.

The telephones used by the defendants were theirs against all the world, even against the telephone company while their tolls were paid. The telephone lines leading to the defendants' houses and offices, as well as the telephone equipment in the houses and offices, were the private property of the defendants. They had the right to the exclusive use and enjoyment of them, except the license given by them to connect other lines with their lines for the purpose of receiving incoming calls. When the government agents tapped the defendants' telephone lines they committed a trespass upon the property rights of the defendants. The effect of this trespass was to project themselves into the houses and offices of the defendants, with the same result as if they had broken through the windows or doors and secretly seized letters containing the identical messages that were transmitted over the 'phones. The result was not only an unlawful search for evidence, but an unlawful seizure by means of which the defendants, in effect, were compelled to testify against themselves. As stated by Judge Rudkin, those who use the telephone are not broadcasting to the world. Under modern conditions the telephone has, to a large extent, supplanted the mails as a means of transmitting private messages. It has become indispensable to every home and office. If the stamp of approval is put upon the ac-

tion of government agents in seeking and obtaining evidence against those suspected of crime by means of tapping private telephone lines, the door is opened wide for the great mass of citizens using the telephone for lawful purposes to have their private and confidential communications relating to business and family subjected to the scrutiny of government agents. Such a system of espionage would become deplorable and unbearable. It would deprive the citizenship of the country of the personal security and the enjoyment of the privacies of life guaranteed by the Constitution, and subject them to an espionage unequalled by the conditions prevailing under the King's officers prior to the Revolution.

*Messrs. Arthur E. Griffin, George F. Vanderveer,* and *Samuel B. Bassett,* on a brief for petitioners in No. 532.

The right to use the telephone, and the right of privacy in its enjoyment, are property rights which the courts have repeatedly upheld. It was precisely this right of privacy or secrecy in business matters which this Court protected in the *Boyd* case. The same was true in *Weeks* v. *United States,* 232 U. S. 383, where the article involved was a canceled lottery ticket having no pecuniary value whatever and which had been seized by government agents solely for evidential purposes. In both of these cases this Court said that each of these Amendments threw much light upon the other because they were designed to remedy the same abuses. And it has always been held that any search and seizure was unreasonable under the provisions of the Fourth Amendment which had for its purpose the compulsory extortion of evidence, no matter what the form of the evidence, to be used in violation of the Fifth Amendment.

In the *Gouled* case it was held immaterial whether the seizure of a man's papers was accompanied by force or threat of force, or whether it was accomplished by stealth.

*Ex parte Jackson* condemned the "bare inspection" of letters in the mail, entirely without reference to the question whether the owner was thereby deprived of his papers or not. It was the violation of their privacy that was obnoxious to the law. See Cooley, Const. Lim., 7th ed., p. 424; *Ex parte Brown,* 7 Mo. App. 484; *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. None of these decisions can be reconciled with the narrow interpretation which the Solicitor General would place upon these Amendments.

It is doubtless true that a message transmitted by telephone is in no sense a paper. But it is also true that privacy is as essential to the conduct of business by telephone or telegraph as by mail, and the courts have always been as ready to protect privacy in the one case as in the other. The Constitution was not written for a day or a year, nor can it be re-written to meet every changing circumstance of our lives. For this reason Constitutions deal with principles.

The Government suggests that the case can not be distinguished from a case where a federal officer on a public street overhears conversations within a citizen's private residence, or where a federal officer joins a band of conspirators and listens from day to day to conversations in their homes and elsewhere. But it seems to us that both these cases are clearly distinguishable from the case at bar on the precise basis that in neither of them was there any wrongful invasion of any right of privacy, but on the contrary in both hypothetical cases the conspirators had themselves thrown privacy to the four winds and, of course, could not be heard to complain of the results of their own folly. Here it is appropriate to call attention to the statute of Washington forbidding the intercepting of telephone or telegraph messages, Remington's Comp. Stats., § 2656, Subdiv. 18, and to a federal statute passed by Congress in 1912 to protect the privacy of the radio.

The abuses of which we complain, in this case are identical in kind with those to which the English people were subjected during the latter half of the Eighteenth Century, and the speeches of Lord Chatham and James Otis, and the letters of Thomas Jefferson and John Adams, leave no doubt in our minds as to how they would have felt on the subject of having government agents tap their private telephone wires. *Burdeau* v. *McDowell*, 256 U. S. 465.

*Mr. Michael J. Doherty*, Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* was on the brief, for the United States.

The Fifth Amendment can only be invoked by first showing that there has been a violation of the Fourth Amendment. The third clause of the Fifth Amendment " nor shall be compelled in any criminal case to be a witness against himself " merely gave constitutional sanction to a rule of common law well established at the time the Constitution was adopted. 6 Jones on Evidence, 2d ed., § 2474; *Twining* v. *New Jersey*, 211 U. S. 78.

Obviously the case has nothing to do with the provision against self-incrimination in its original and primary sense, that is, the compulsion of the accused by legal process to produce in court evidence either testimonial or physical. Ordinarily evidence of incriminating oral statements made by the accused before, during, or after the commission of a crime, overheard by a witness and testified to by him in court, is always competent.

The only inhibition against evidence in this form is that which forbids evidence of extorted confessions. Here there was neither extortion nor confession. There was no coercion, threat or promise. Moreover, the conversations were not in the nature of confessions. They were a part and parcel of the criminal transaction. The prohibition officers, relating in court what they overheard, were testi-

fying as immediate witnesses of the crime, as much so as would be a witness who testified to having seen liquor delivered and the price paid.

Aside from the rule against duress of legal process and extorted confessions, it was a fundamental and time-honored rule of common law that evidence was not rendered inadmissible in a criminal case by illegality of the means by which it was obtained. This rule of the common law is still in force in England and Canada and in a majority of the States. The illegality dealt with in many of the state cases was the violation of the constitutional rights under provisions of state constitutions substantially identical with the Fourth Amendment. 5 Jones on Evidence, c. 22; Blakemore on Prohibition, 2d. ed., p. 519; Cornelius on Search and Seizure, p. 45; Search and Seizure, 8 Am. Bar. Ass'n Journal, p. 479; *State* v. *Aime*, 62 Utah 476; *State* v. *Owens*, 302 Mo. 348.

In the light of *Boyd* v. *United States*, 116 U. S. 616; *Adams* v. *New York*, 192 U. S. 585; *Weeks* v. *United States*, 232 U. S. 383; *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385; *Gouled* v. *United States*, 255 U. S. 298; *Agnello* v. *United States*, 269 U. S. 20; *Amos* v. *United States*, 255 U. S. 313; *Byars* v. *United States*, 273 U. S. 28; and *Marron* v. *United States*, 275 U. S. 192, it is not open to question that evidence obtained by federal officers in violation of the Fourth Amendment is inadmissible as evidence in criminal trials in federal courts. To that extent the common law rule and anything said to the contrary in the *Adams* case has been abandoned.

The limits of this departure from the common law rule are, however, definite. The reason for it appears to be the close interrelation that is conceived to exist between the Fourth and the Fifth Amendments. It has never been extended to evidence obtained illegally in the general sense, but only where the illegality amounts to a violation of the Fourth Amendment. Evidence obtained

by trespass, fraud, unethical or even criminal methods, is admissible if the Fourth Amendment be not violated. 5 Jones on Evidence, §§ 2075 et seq.; *Adams* v. *New York, supra; Hester* v. *United States,* 265 U. S. 57; *McGuire* v. *United States,* 273 U. S. 95; *Koths* v. *United States,* 16 F. (2d) 59; *United States* v. *Mandel,* 17 F. (2d) 270.

The Fifth Amendment therefore is not involved in this case, unless it can be invoked as a result of a violation of the Fourth Amendment.

The Fourth Amendment was the direct consequence of two abuses practiced by the English Government—the use of general warrants and the use of writs of assistance. The *Wilkes* and *Entick* cases, in their criminal and civil aspects, attracted universal attention and aroused tremendous opposition to the use of general warrants, resulting in their condemnation by the courts and a declaration of their illegality by the House of Commons. May, Const. Hist. of England, p. 110 et seq.; 1 Cooley, Const. Lim., 8th ed., p. 612; *Boyd* v. *United States, supra*; 19 How. State Trials, 1029, 1153.

The use of writs of assistance in the American Colonies was authorized by the Act of Parliament of 1767, 7 Geo. III, c. 46. The use of the writs soon led to great public agitation and opposition, particularly in Massachusetts, led by James Otis, but their use continued to the outbreak of the Revolution. 3 Channing, Hist. of U. S., pp. 1–5 and 114. Knowledge and apprehension of these abuses—warrants and writs—was fresh in the minds of the colonial statesmen when it came to framing the Constitution.

The Virginia Constitution had already adopted a bill of rights, of which § 10 was as follows:

" That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particu-

larly described and supported by evidence, are grievous and oppressive, and ought not to be 'granted."

An amendment to the Federal Constitution similar to this was proposed by the Virginia ratification convention. Journal of the Convention of Virginia, p. 34. As introduced by James Madison at the first session of Congress it read:

" The right of the people to be secured in their persons, their houses, their papers, and their other property from all unreasonable searches and seizures, shall not be violated by warrants issued without probable cause, supported by oath or affirmation, or not particularly describing the places to be searched, or the persons or things to be seized." Annals of Congress, Vol. I, col. 434.

A committee of one member from each State was appointed to consider and report such amendments as ought to be proposed by Congress to the legislatures of the States. In the report of this committee was proposed an amendment differing but slightly from that originally proposed by Madison. The word " effects " was substituted for the words "other property." Mr. Gerry, saying that he presumed there was a mistake in the wording of the clause, moved that it be amended to read: " The right of the people to be secured in their persons, houses, papers, and effects against unreasonable seizures and searches . . ." Annals of Congress, Vol. I, col. 754.

The amendment came out of conference committee in its present form, and we have no light as to the reason for the further change in phraseology. It is quite apparent that the principal, if not the sole, peril in the minds of those who advocated the amendment and against which its protection was intended was the use of general warrants and the writs of assistance.

In *Boyd* v. *United States, supra,* the Court said that the judgment of Lord Camden in *Entick* v. *Carrington* might be considered as sufficiently explanatory of what was

meant by unreasonable searches and seizures; and Chief Justice Taft in the *Carroll* case said that the Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted.

This Court has frequently said that the Fourth and Fifth Amendments should be construed liberally; but it is submitted that by no liberality of construction can a conversation passing over a telephone wire become a " house," no more can it become a " person," a " paper," or an " effect." " Effects " is the least definite of the four words. This Court has said of " effects " that—

" when the word is used alone, or *simpliciter,* it means all kinds of personal estate. . . . But if there be some word used with it, restraining its meaning, then it is governed by that, or means something *ejusdem generis.*" *Planters Bank* v. *Sharp,* 6 How. 301, 321.

Giving to the word its literal import, the sense in which it is generally understood, its natural significance taken in connection with the context in which it appears, it does not seem possible to include within its meaning anything other than tangible personal property, or to extend it to include a telephone conversation or any intangible right of privacy of the parties with respect to such conversation. - Petitioners are urging the extension of the Fourth Amendment into a new field, the limits of which are difficult to define. If evidence obtained by tapping telephone wires at points not in private dwellings is excluded on constitutional grounds, on the same principle would not all manner of evidence gathered by ruse or entrapment have to be excluded? Suppose an officer obtains access to a telephone on a party line and listens to incriminating conversations of other parties having telephones on the line; suppose that, instead of tapping a wire, he goes to the telephone exchange and, with or without permission of the operator, plugs in on a private

452

line, and listens; suppose he leases an office and puts a dictaphone in the wall of the adjoining office and listens; suppose without trespassing he is able to put his ear to the keyhole of the door of an office or house and listens; suppose he pretends to join a conspiracy and thereby gains access to the inner councils of the conspirators and hears the hatching of their criminal schemes. These examples, varying into slight shades of distinction, might be multiplied indefinitely to show the extremes to which the principle contended for would lead. Once cut loose from the fair literal import of the language of the Amendment, and there is no place to anchor.

In the construction of the Amendment a balance should be sought between that which will preserve the fundamental safeguard which the Amendment was designed to secure, and at the same time not unduly fetter the arm of the Government in the enforcement of law. The practical aspect of the problem is forcibly expressed in *People* v. *Mayen*, 188 Cal. 237.

If, in any circumstances, obtaining evidence by tapping wires is deemed an objectionable governmental practice, it may be regulated or forbidden by statute, or avoided by officers of the law, but clearly the Constitution does not forbid it unless it involves actual unlawful entry into a house.

*Messrs. Otto B. Rupp, Charles M. Bracelen, Robert H. Strahan,* and *Clarence B. Randall* on behalf of The Pacific Telephone and Telegraph Company, American Telephone and Telegraph Company, United States Independent Telephone Association, and the Tri-State Telephone and Telegraph Company, as *amici curiae,* filed a brief by special leave of Court.

The petitioners were using the telephone lines and facilities of the local telephone company, such as were available to everyone without discrimination. The func-

tion of a telephone system in our modern economy is, so far as reasonably practicable, to enable any two persons at a distance to converse privately with each other as they might do if both were personally present in the privacy of the home or office of either one. When the lines of two "parties" are connected at the central office, they are intended to be devoted to their exclusive use, and in that sense to be turned over to their exclusive possession. A third person who taps the lines violates the property rights of both persons then using the telephone, and of the telephone company as well. *Internat'l News Service* v. *Associated Press*, 248 U. S. 215.

It is of the very nature of the telephone service that it shall be private; and hence it is that wire tapping has been made an offense punishable either as a felony or misdemeanor by the legislatures of twenty-eight States, and that in thirty-five States there are statutes in some form intended to prevent the disclosure of telephone or telegraph messages, either by connivance with agents of the companies or otherwise.

The wire tapper destroys this privacy. He invades the "person" of the citizen, and his "house," secretly and without warrant. Having regard to the substance of things, he would not do this more truly if he secreted himself in the home of the citizen.

In view of what this Court has held as to the intent and scope of the Fourth and Fifth Amendments, it would not seem necessary to enter into any meticulous examination of their precise words. But if that be done, does not wire tapping involve an "unreasonable search," of the "house" and of the "person"? There is of course no search warrant, as in the nature of the case there could not be. If the agent should secrete himself in the house or office to examine documents, would not that constitute a "search"? Is the case any different in the eyes of the law if from a distance the agent physically

enters upon the property of the citizen, as he does when he taps the wire, and from that point projects himself into the house? Certainly in its practical aspect the latter case is worse than the first, because the citizen is utterly helpless to detect the espionage to which he is subjected.

If it be said that, in any event, there is no "seizure," that an oral conversation cannot be seized, we answer, in the first place, that this is a purely superficial view, which puts the letter above the spirit and intent of the law. The "privacy of life" and the liberty of the citizen have been invaded. And, in the second place, we do not understand that seizure is a necessary element to constitute the offense. An unreasonable search alone violates the Fourth Amendment. It is enough that the federal officer has made an unreasonable search, within the meaning of the Fourth Amendment, and has thereby unlawfully obtained evidence. The evidence so obtained is excluded under the provisions of the Fifth Amendment.

The Government itself provides the mail service, a public service, and the Government authorizes the telephone company to provide the telephone service, also a public service. It is settled that the communication in the mail is protected. Upon what reason, then, can it be said that the communication by telephone is not protected?

The telephone has become part and parcel of the social and business intercourse of the people of the United States, and the telephone system offers a means of espionage compared to which general warrants and writs of assistance were the puniest instruments of tyranny and oppression.

The telephone companies deplore the use of their facilities in furtherance of any criminal or wrongful enterprise. But it was not solicitude for law breakers that caused the people of the United States to ordain the Fourth and

Fifth Amendments as part of the Constitution. Criminals will not escape detection and conviction merely because evidence obtained by tapping wires of a public telephone system is inadmissible, if it should be so held; but, in any event, it is better that a few criminals escape than that the privacies of life of all the people be exposed to the agents of the Government, who will act at their own discretion, the honest and the dishonest, unauthorized and unrestrained by the courts. Legislation making wire tapping a crime will not suffice if the courts nevertheless hold the evidence to be lawful. Writs of assistance might have been abolished by statute, but the people were wise to abolish them by the Bill of Rights.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

These cases are here by certiorari from the Circuit Court of Appeals for the Ninth Circuit. 19 F. (2d) 842 and 850. The petition in No. 493 was filed August 30, 1927; in Nos. 532 and 533, September 9, 1927. They were granted with the distinct limitation that the hearing should be confined to the single question whether the use of evidence of private telephone conversations between the defendants and others, intercepted by means of wire tapping, amounted to a violation of the Fourth and Fifth Amendments.

The petitioners were convicted in the District Court for the Western District of Washington of a conspiracy to violate the National Prohibition Act by unlawfully possessing, transporting and importing intoxicating liquors and maintaining nuisances, and by selling intoxicating liquors. Seventy-two others in addition to the petitioners were indicted. Some were not apprehended, some were acquitted and others pleaded guilty.

The evidence in the records discloses a conspiracy of amazing magnitude to import, possess and sell liquor un-

lawfully. It involved the employment of not less than fifty persons, of two seagoing vessels for the transportation of liquor to British Columbia, of smaller vessels for coastwise transportation to the State of Washington, the purchase and use of a ranch beyond the suburban limits of Seattle, with a large underground cache for storage and a number of smaller caches in that city, the maintenance of a central office manned with operators, the employment of executives, salesmen, deliverymen, dispatchers, scouts, bookkeepers, collectors and an attorney. In a bad month sales amounted to $176,000; the aggregate for a year must have exceeded two millions of dollars.

Olmstead was the leading conspirator and the general manager of the business. He made a contribution of $10,000 to the capital; eleven others contributed $1,000 each. The profits were divided one-half to Olmstead and the remainder to the other eleven. Of the several offices in Seattle the chief one was in a large office building. In this there were three telephones on three different lines. There were telephones in an office of the manager in his own home, at the homes of his associates, and at other places in the city. Communication was had frequently with Vancouver, British Columbia. Times were fixed for the deliveries of the "stuff," to places along Puget Sound near Seattle and from there the liquor was removed and deposited in the caches already referred to. One of the chief men was always on duty at the main office to receive orders by telephones and to direct their filling by a corps of men stationed in another room—the "bull pen." The call numbers of the telephones were given to those known to be likely customers. At times the sales amounted to 200 cases of liquor per day.

The information which led to the discovery of the conspiracy and its nature and extent was largely obtained by intercepting messages on the telephones of the conspirators by four federal prohibition officers. Small

wires were inserted along the ordinary telephone wires from the residences of four of the petitioners and those leading from the chief office. The insertions were made without trespass upon any property of the defendants. They were made in the basement of the large office building. The taps from house lines were made in the streets near the houses.

The gathering of evidence continued for many months. Conversations of the conspirators of which refreshing stenographic notes were currently made, were testified to by the government witnesses. They revealed the large business transactions of the partners and their subordinates. Men at the wires heard the orders given for liquor by customers and the acceptances; they became auditors of the conversations between the partners. All this disclosed the conspiracy charged in the indictment. Many of the intercepted conversations were not merely reports but parts of the criminal acts. The evidence also disclosed the difficulties to which the conspirators were subjected, the reported news of the capture of vessels, the arrest of their men and the seizure of cases of liquor in garages and other places. It showed the dealing by Olmstead, the chief conspirator, with members of the Seattle police, the messages to them which secured the release of arrested members of the conspiracy, and also direct promises to officers of payments as soon as opportunity offered.

The Fourth Amendment provides—" The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized." And the Fifth: " No person . . shall be compelled, in any criminal case, to be a witness against himself."

It will be helpful to consider the chief cases in this Court which bear upon the construction of these Amendments.

*Boyd* v. *United States*, 116 U. S. 616, was an information filed by the District Attorney in the federal court in a cause of seizure and forfeiture against thirty-five cases of plate glass, which charged that the owner and importer, with intent to defraud the revenue, made an entry of the imported merchandise by means of a fraudulent or false invoice. It became important to show the quantity and value of glass contained in twenty-nine cases previously imported. The fifth section of the Act of June 22, 1874, provided that in cases not criminal under the revenue laws, the United States Attorney, whenever he thought an invoice, belonging to the defendant, would tend to prove any allegation made by the United States, might by a written motion describing the invoice and setting forth the allegation which he expected to prove, secure a notice from the court to the defendant to produce the invoice, and if the defendant refused to produce it, the allegations stated in the motion should be taken as confessed, but if produced, the United States Attorney should be permitted, under the direction of the court, to make an examination of the invoice, and might offer the same in evidence. This Act had succeeded the Act of 1867, which provided that in such cases the District Judge, on affidavit of any person interested, might issue a warrant to the marshal to enter the premises where the invoice was and take possession of it and hold it subject to the order of the judge. This had been preceded by the Act of 1863 of a similar tenor, except that it directed the warrant to the collector instead of the marshal. The United States Attorney followed the Act of 1874 and compelled the production of the invoice.

The court held the Act of 1874 repugnant to the Fourth and Fifth Amendments. As to the Fourth Amendment, Justice Bradley said (page 621):

" But, in regard to the Fourth Amendment, it is contended that, whatever might have been alleged against the constitutionality of the acts of 1863 and 1867, that of 1874, under which the order in the present case was made, is free from constitutional objection because it does not authorize the search and seizure of books and papers, but only requires the defendant or claimant to produce them. That is so; but it declares that if he does not produce them, the allegations which it is affirmed they will prove shall be taken as confessed. This is tantamount to compelling their production; for the prosecuting attorney will always be sure to state the evidence expected to be derived from them as strongly as the case will admit of. It is true that certain aggravating incidents of actual search and seizure, such as forcible entry into a man's house and searching amongst his papers, are wanting, and to this extent the proceeding under the Act of 1874 is a mitigation of that which was authorized by the former acts; but it accomplishes the substantial object of those acts in forcing from a party evidence against himself. It is our opinion, therefore, that a compulsory production of a man's private papers to establish a criminal charge against him, or to forfeit his property, is within the scope of the Fourth Amendment to the Constitution, in all cases in which a search and seizure would be; because it is a material ingredient, and effects the sole object and purpose of search and seizure."

Concurring, Mr. Justice Miller and Chief Justice Waite said that they did not think the machinery used to get this evidence amounted to a search and seizure, but they agreed that the Fifth Amendment had been violated.

The statute provided an official demand for the production of a paper or document by the defendant for official search and use as evidence on penalty that by refusal he should be conclusively held to admit the incriminat-

ing character of the document as charged. It was certainly no straining of the language to construe the search and seizure under the Fourth Amendment to include such official procedure.

The next case, and perhaps the most important, is *Weeks* v. *United States*, 232 U. S. 383,—a conviction for using the mails to transmit coupons or tickets in a lottery enterprise. The defendant was arrested by a police officer without a warrant. After his arrest other police officers and the United States marshal went to his house, got the key from a neighbor, entered the defendant's room and searched it, and took possession of various papers and articles. Neither the marshal nor the police officers had a search warrant. The defendant filed a petition in court asking the return of all his property. The court ordered the return of everything not pertinent to the charge, but denied return of relevant evidence. After the jury was sworn, the defendant again made objection, and on introduction of the papers contended that the search without warrant was a violation of the Fourth and Fifth Amendments and they were therefore inadmissible. This court held that such taking of papers by an official of the United States, acting under color of his office, was in violation of the constitutional rights of the defendant, and upon making seasonable application he was entitled to have them restored, and that by permitting their use upon the trial, the trial court erred.

The opinion cited with approval language of Mr. Justice Field in *Ex parte Jackson*, 96 U. S. 727, 733, saying that the Fourth Amendment as a principle of protection was applicable to sealed letters and packages in the mail and that, consistently with it, such matter could only be opened and examined upon warrants issued on oath or affirmation particularly describing the thing to be seized.

In *Silverthorne Lumber Company* v. *United States*, 251 U. S. 385, the defendants were arrested at their homes and

detained in custody. While so detained, representatives of the Government without authority went to the office of their company and seized all the books, papers and documents found there. An application for return of the things was opposed by the District Attorney, who produced a subpoena for certain documents relating to the charge in the indictment then on file. The court said:

" Thus the case is not that of knowledge acquired through the wrongful act of a stranger, but it must be assumed that the Government planned or at all events ratified the whole performance."

And it held that the illegal character of the original seizure characterized the entire proceeding and under the *Weeks* case the seized papers must be restored.

In *Amos* v. *United States*, 255 U. S. 313, the defendant was convicted of concealing whiskey on which the tax had not been paid. At the trial he presented a petition asking that private property seized in a search of his house and store " within his curtilage," without warrant should be returned. This was denied. A woman, who claimed to be his wife, was told by the revenue officers that they had come to search the premises for violation of the revenue law. She opened the door; they entered and found whiskey. Further searches in the house disclosed more. It was held that this action constituted a violation of the Fourth Amendment, and that the denial of the motion to restore the whiskey and to exclude the testimony was error.

In *Gouled* v. *The United States,* 255 U. S. 298, the facts were these: Gouled and two others were charged with conspiracy to defraud the United States. One pleaded guilty and another was acquitted. Gouled prosecuted error. The matter was presented here on questions propounded by the lower court. The first related to the admission in evidence of a paper surreptitiously taken from the office of the defendant by one acting under the direc-

tion of an officer of the Intelligence Department of the Army of the United States. Gouled was suspected of the crime. A private in the U. S. Army, pretending to make a friendly call on him, gained admission to his office and in his absence, without warrant of any character, seized and carried away several documents. One of these belonging to Gouled, was delivered to the United States Attorney and by him introduced in evidence. When produced, it was a surprise to the defendant. He had had no opportunity to make a previous motion to secure a return of it. The paper had no pecuniary value, but was relevant to the issue made on the trial. Admission of the paper was considered a violation of the Fourth Amendment.

*Agnello* v. *United States*, 269 U. S. 20, held that the Fourth and Fifth Amendments were violated by admission in evidence of contraband narcotics found in defendant's house, several blocks distant from the place of arrest, after his arrest, and seized there without a warrant. Under such circumstances the seizure could not be justified as incidental to the arrest.

There is no room in the present case for applying the Fifth Amendment unless the Fourth Amendment was first violated. There was no evidence of compulsion to induce the defendants to talk over their many telephones. They were continually and voluntarily transacting business without knowledge of the interception. Our consideration must be confined to the Fourth Amendment.

The striking outcome of the *Weeks* case and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a violation of the Amendment. Theretofore many had supposed that under the ordinary common law rules, if the tendered evidence was pertinent, the method of obtaining it was

unimportant. This was held by the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Dana,* 2 Metcalf, 329, 337. There it was ruled that the only remedy open to a defendant whose rights under a state constitutional equivalent of the Fourth Amendment had been invaded was by suit and judgment for damages, as Lord Camden held in *Entick* v. *Carrington,* 19 Howell State Trials, 1029. Mr. Justice Bradley made effective use of this case in *Boyd* v. *United States.* But in the *Weeks* case, and those which followed, this Court decided with great emphasis, and established as the law for the federal courts, that the protection of the Fourth Amendment would be much impaired unless it was held that not only was the official violator of the rights under the Amendment subject to action at the suit of the injured defendant, but also that the evidence thereby obtained could not be received.

The well known historical purpose of the Fourth Amendment, directed against general warrants and writs of assistance, was to prevent the use of governmental force to search a man's house, his person, his papers and his effects; and to prevent their seizure against his will. This phase of the misuse of governmental power of compulsion is the emphasis of the opinion of the Court in the *Boyd* case. This appears too in the *Weeks* case, in the *Silverthorne* case and in the *Amos* case.

*Gouled* v. *United States* carried the inhibition against unreasonable searches and seizures to the extreme limit. Its authority is not to be enlarged by implication and must be confined to the precise state of facts disclosed by the record. A representative of the Intelligence Department of the Army, having by stealth obtained admission to the defendant's office, seized and carried away certain private papers valuable for evidential purposes. This was held an unreasonable search and seizure within the Fourth Amendment. A stealthy entrance in such cir-

cumstances became the equivalent to an entry by force. There was actual entrance into the private quarters of defendant and the taking away of something tangible. Here we have testimony only of voluntary conversations secretly overheard.

The Amendment itself shows that the search is to be of material things—the person, the house, his papers or his effects. The description of the warrant necessary to make the proceeding lawful, is that it must specify the place to be searched and the person or *things* to be seized.

It is urged that the language of Mr. Justice Field in *Ex parte Jackson,* already quoted, offers an analogy to the interpretation of the Fourth Amendment in respect of wire tapping. But the analogy fails. The Fourth Amendment may have proper application to a sealed letter in the mail because of the constitutional provision for the Postoffice Department and the relations between the Government and those who pay to secure protection of their sealed letters. See Revised Statutes, §§ 3978 to 3988, whereby Congress monopolizes the carriage of letters and excludes from that business everyone else, and § 3929 which forbids any postmaster or other person to open any letter not addressed to himself. It is plainly within the words of the Amendment to say that the unlawful rifling by a government agent of a sealed letter is a search and seizure of the sender's papers or effects. The letter is a paper, an effect, and in the custody of a Government that forbids carriage except under its protection.

The United States takes no such care of telegraph or telephone messages as of mailed sealed letters. The Amendment does not forbid what was done here. There was no searching. There was no seizure. The evidence was secured by the use of the sense of hearing and that only. There was no entry of the houses or offices of the defendants.

By the invention of the telephone, fifty years ago, and its application for the purpose of extending communications, one can talk with another at a far distant place. The language of the Amendment can not be extended and expanded to include telephone wires reaching to the whole world from the defendant's house or office. The intervening wires are not part of his house or office any more than are the highways along which they are stretched.

This Court in *Carroll* v. *United States,* 267 U. S. 132, 149, declared:

"The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted and in a manner which will conserve public interests as well as the interests and rights of individual citizens."

Justice Bradley in the *Boyd* case, and Justice Clark in the *Gould* case, said that the Fifth Amendment and the Fourth Amendment were to be liberally construed to effect the purpose of the framers of the Constitution in the interest of liberty. But that can not justify enlargement of the language employed beyond the possible practical meaning of houses, persons, papers, and effects, or so to apply the words search and seizure as to forbid hearing or sight.

*Hester* v. *United States,* 265 U. S. 57, held that the testimony of two officers of the law who trespassed on the defendant's land, concealed themselves one hundred yards away from his house and saw him come out and hand a bottle of whiskey to another, was not inadmissible. While there was a trespass, there was no search of person, house, papers or effects. *United States* v. *Lee,* 274 U. S. 559, 563; *Eversole* v. *State,* 106 Tex. Cr. 567.

Congress may of course protect the secrecy of telephone messages by making them, when intercepted, inadmissible in evidence in federal criminal trials, by direct legislation,

and thus depart from the common law of evidence. But the courts may not adopt such a policy by attributing an enlarged and unusual meaning to the Fourth Amendment. The reasonable view is that one who installs in his house a telephone instrument with connecting wires intends to project his voice to those quite outside, and that the wires beyond his house and messages while passing over them are not within the protection of the Fourth Amendment. Here those who intercepted the projected voices were not in the house of either party to the conversation.

Neither the cases we have cited nor any of the many federal decisions brought to our attention hold the Fourth Amendment to have been violated as against a defendant unless there has been an official search and seizure of his person, or such a seizure of his papers or his tangible material effects, or an actual physical invasion of his house " or curtilage " for the purpose of making a seizure.

We think, therefore, that the wire tapping here disclosed did not amount to a search or seizure within the meaning of the Fourth Amendment.

What has been said disposes of the only question that comes within the terms of our order granting certiorari in these cases. But some of our number, departing from that order, have concluded that there is merit in the two-fold objection overruled in both courts below that evidence obtained through intercepting of telephone messages by government agents was inadmissible because the mode of obtaining it was unethical and a misdemeanor under the law of Washington. To avoid any misapprehension of our views of that objection we shall deal with it in both of its phases.

While a Territory, the English common law prevailed in Washington and thus continued after her admission in 1889. The rules of evidence in criminal cases in courts of the United States sitting there, consequently are those of the common law. *United States* v. *Reid*, 12 How. 361,

363, 366; *Logan* v. *United States,* 144 U. S. 263, 301; *Rosen* v. *United States,* 245 U. S. 467; *Withaup* v. *United States,* 127 Fed. 530, 534; *Robinson* v. *United States,* 292 Fed. 683, 685.

The common law rule is that the admissibility of evidence is not affected by the illegality of the means by which it was obtained. Professor Greenleaf in his work on evidence, vol. 1, 12th ed., by Redfield, § 254(a) says:

" It may be mentioned in this place, that though papers and other subjects of evidence may have been *illegally taken* from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue, to determine that question."

Mr. Jones in his work on the same subject refers to Mr. Greenleaf's statement, and says:

" Where there is no violation of a constitutional guaranty, the verity of the above statement is absolute." Vol. 5, § 2075, note 3.

The rule is supported by many English and American cases cited by Jones in vol. 5, § 2075, note 3, and § 2076, note 6; and by Wigmore, vol. 4, § 2183. It is recognized by this Court in *Adams* v. *New York,* 192 U. S. 585. The *Weeks* case, announced an exception to the common law rule by excluding all evidence in the procuring of which government officials took part by methods forbidden by the Fourth and Fifth Amendments. Many state courts do not follow the *Weeks* case. *People* v. *Defore,* 242 N. Y. 13. But those who do, treat it as an exception to the general common law rule and required by constitutional limitations. *Hughes* v. *State,* 145 Tenn. 544, 551, 566; *State* v. *Wills,* 91 W. Va. 659, 677; *State* v. *Slamon,* 73 Vt. 212, 214, 215; *Gindrat* v. *People,* 138 Ill. 103, 111; *People* v. *Castree,* 311 Ill. 392, 396, 397; *State* v.

468

*Gardner,* 77 Mont. 8, 21; *State* v. *Fahn,* 53 N. Dak. 203, 210. The common law rule must apply in the case at bar.

Nor can we, without the sanction of congressional enactment, subscribe to the suggestion that the courts have a discretion to exclude evidence, the admission of which is not unconstitutional, because unethically secured. This would be at variance with the common law doctrine generally supported by authority. There is no case that sustains, nor any recognized text book that gives color to such a view. Our general experience shows that much evidence has always been receivable although not obtained by conformity to the highest ethics. The history of criminal trials shows numerous cases of prosecutions of oathbound conspiracies for murder, robbery, and other crimes, where officers of the law have disguised themselves and joined the organizations, taken the oaths and given themselves every appearance of active members engaged in the promotion of crime, for the purpose of securing evidence. Evidence secured by such means has always been received.

A standard which would forbid the reception of evidence if obtained by other than nice ethical conduct by government officials would make society suffer and give criminals greater immunity than has been known heretofore. In the absence of controlling legislation by Congress, those who realize the difficulties in bringing offenders to justice may well deem it wise that the exclusion of evidence should be confined to cases where rights under the Constitution would be violated by admitting it.

The statute of Washington, adopted in 1909, provides (Remington Compiled Statutes, 1922, § 2656–18) that:

"Every person . . . . who shall intercept, read or in any manner interrupt or delay the sending of a message over any telegraph or telephone line . . . : shall be guilty of a misdemeanor."

This statute does not declare that evidence obtained by such interception shall be inadmissible, and by the common law, already referred to, it would not be. *People* v. *McDonald,* 177 App. Div. (N. Y.) 806. Whether the State of Washington may prosecute and punish federal officers violating this law and those whose messages were intercepted may sue them civilly is not before us. But clearly a statute, passed twenty years after the admission of the State into the Union can not affect the rules of evidence applicable in courts of the United States in criminal cases. Chief Justice Taney, in *United States* v. *Reid,* 12 How. 361, 363, construing the 34th section of the Judiciary Act, said:

" But it could not be supposed, without very plain words to show it, that Congress intended to give the states the power of prescribing the rules of evidence in trials for offenses against the United States. For this construction would place the criminal jurisprudence of one sovereignty under the control of another." See also *Withaup* v. *United States,* 127 Fed. 530, 534.

The judgments of the Circuit Court of Appeals are affirmed. The mandates will go down forthwith under Rule 31.

*Affirmed.*

Mr. Justice Holmes:

My brother Brandeis has given this case so exhaustive an examination that I desire to add but a few words. While I do not deny it, I am not prepared to say that the penumbra of the Fourth and Fifth Amendments covers the defendant, although I fully agree that Courts are apt to err by sticking too closely to the words of a law where those words import a policy that goes beyond them. *Gooch* v. *Oregon Short Line R. R. Co.,* 258 U. S. 22, 24. But I think, as Mr. Justice Brandeis says, that apart from the Constitution the Government ought not to use

evidence obtained and only obtainable by a criminal act. There is no body of precedents by which we are bound, and which confines us to logical deduction from established rules. Therefore we must consider the two objects of desire, both of which we cannot have, and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the Government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. If it pays its officers for having got evidence by crime I do not see why it may not as well pay them for getting it in the same way, and I can attach no importance to protestations of disapproval if it knowingly accepts and pays and announces that in future it will pay for the fruits. We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part.

For those who agree with me, no distinction can be taken between the Government as prosecutor and the Government as judge. If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed. See *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. And if all that I have said so far be accepted it makes no difference that in this case wire tapping is made a crime by the law of the State, not by the law of the United States. It is true that a State cannot make rules of evidence for Courts of the United States, but the State has authority over the conduct in question, and I hardly think that the United States would appear to greater advantage when paying for an odious crime against State law than when inciting to the disregard of its own. I am aware of the often repeated statement that in a criminal proceeding the Court will not take notice of the manner in which papers offered in evidence have been

obtained. But that somewhat rudimentary mode of disposing of the question has been overthrown by *Weeks* v. *United States,* 232 U. S. 383 and the cases that have followed it. I have said that we are free to choose between two principles of policy. But if we are to confine ourselves to precedent and logic the reason for excluding evidence obtained by violating the Constitution seems to me logically to lead to excluding evidence obtained by a crime of the officers of the law.

MR. JUSTICE BRANDEIS, dissenting.

The defendants were convicted of conspiring to violate the National Prohibition Act. Before any of the persons now charged had been arrested or indicted, the telephones by means of which they habitually communicated with one another and with others had been tapped by federal officers. To this end, a lineman of long experience in wire-tapping was employed, on behalf of the Government and at its expense. He tapped eight telephones, some in the homes of the persons charged, some in their offices. Acting on behalf of the Government and in their official capacity, at least six other prohibition agents listened over the tapped wires and reported the messages taken. Their operations extended over a period of nearly five months. The type-written record of the notes of conversations overheard occupies 775 typewritten pages. By objections seasonably made and persistently renewed, the defendants objected to the admission of the evidence obtained by wire-tapping, on the ground that the Government's wire-tapping constituted an unreasonable search and seizure, in violation of the Fourth Amendment; and that the use as evidence of the conversations overheard compelled the defendants to be witnesses against themselves, in violation of the Fifth Amendment.

The Government makes no attempt to defend the methods employed by its officers. Indeed, it concedes

that if wire-tapping can be deemed a search and seizure within the Fourth Amendment, such wire-tapping as was practiced in the case at bar was an unreasonable search and seizure, and that the evidence thus obtained was inadmissible. But it relies on the language of the Amendment; and it claims that the protection given thereby cannot properly be held to include a telephone conversation.

"We must never forget," said Mr. Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, 407, "that it is a constitution we are expounding." Since then, this Court has repeatedly sustained the exercise of power by Congress, under various clauses of that instrument, over objects of which the Fathers could not have dreamed. See *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.,* 96 U. S. 1, 9; *Northern Pacific Ry. Co.* v. *North Dakota,* 250 U. S. 135; *Dakota Central Telephone Co.* v. *South Dakota,* 250 U. S. 163; *Brooks* v. *United States,* 267 U. S. 432. We have likewise held that general limitations on the powers of Government, like those embodied in the due process clauses of the Fifth and Fourteenth Amendments, do not forbid the United States or the States from meeting modern conditions by regulations which "a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive." *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 387; *Buck* v. *Bell,* 274 U. S. 200. Clauses guaranteeing to the individual protection against specific abuses of power, must have a similar capacity of adaptation to a changing world. It was with reference to such a clause that this Court said in *Weems* v. *United States,* 217 U. S. 349, 373: "Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions

and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall ' designed to approach immortality as nearly as human institutions can approach it.' The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality."

When the Fourth and Fifth Amendments were adopted, " the form that evil had theretofore taken," had been necessarily simple. Force and violence were then the only means known to man by which a Government could directly effect self-incrimination. It could compel the individual to testify—a compulsion effected, if need be, by torture. It could secure possession of his papers and other articles incident to his private life—a seizure effected, if need be, by breaking and entry. Protection against such invasion of " the sanctities of a man's home and the privacies of life " was provided in the Fourth and Fifth Amendments by specific language. *Boyd* v. *United States*, 116 U. S. 616, 630. But " time works changes, brings into existence new conditions and purposes." Subtler and more far-reaching means of invading privacy have become available to the Government. Discovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet.

Moreover, " in the application of a constitution, our contemplation cannot be only of what has been but of what may be." The progress of science in furnishing the Government with means of espionage is not likely to stop with wire-tapping. Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home. Advances in the psychic and related sciences may bring means of exploring unexpressed beliefs, thoughts and emotions. " That places the liberty of every man in the hands of every petty officer " was said by James Otis of much lesser intrusions than these.[1] To Lord Camden, a far slighter intrusion seemed " subversive of all the comforts of society." [2] Can it be that the Constitution affords no protection against such invasions of individual security?

A sufficient answer is found in *Boyd* v. *United States,* 116 U. S. 616, 627–630, a case that will be remembered as long as civil liberty lives in the United States. This Court there reviewed the history that lay behind the Fourth and Fifth Amendments. We said with reference to Lord Camden's judgment in *Entick* v. *Carrington,* 19 Howell's State Trials, 1030: " The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case there before the court, with its adventitious circumstances; they apply to all invasions on the part of the Government and its employés of the sanctities of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal se-

---

[1] Otis' Argument against Writs of Assistance. See Tudor, James Otis, p. 66; John Adams, Works, Vol. II, p. 524; Minot, Continuation of the History of Massachusetts Bay, Vol. II, p. 95.

[2] *Entick* v. *Carrington,* 19 Howell's State Trials, 1030, 1066.

curity, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence of a crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other." [3]

In *Ex parte Jackson,* 96 U. S. 727, it was held that a sealed letter entrusted to the mail is protected by the Amendments. The mail is a public service furnished by the Government. The telephone is a public service furnished by its authority. There is, in essence, no difference between the sealed letter and the private telephone message. As Judge Rudkin said below: " True the one is visible, the other invisible; the one is tangible, the other intangible; the one is sealed and the other unsealed, but these are distinctions without a difference." The evil incident to invasion of the privacy of the telephone is far greater than that involved in tampering with the mails. Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded and all con-

---

[3] In *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 479, the statement made in the *Boyd* case was repeated; and the Court quoted the statement of Mr. Justice Field in *In re Pacific Railway Commission,* 32 Fed. 241, 250:" Of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protection of his person from assault, but exemption of his private affairs, books, and papers, from the inspection and scrutiny of others. Without the enjoyment of this right, all others would lose half their value." The *Boyd* case has been recently reaffirmed in *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, in *Gouled* v. *United States,* 255 U. S. 298, and in *Byars* v. *United States,* 273 U. S. 28.

versations between them upon any subject, and although proper, confidential and privileged, may be overheard. Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may·call or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire-tapping.

Time and again, this Court in giving effect to the principle underlying the Fourth Amendment, has refused to place an unduly literal construction upon it. This was notably illustrated in the *Boyd* case itself. Taking language in its ordinary meaning, there is no "search" or "seizure" when a defendant is required to produce a document in the orderly process of a court's procedure. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," would not be violated, under any ordinary construction of language, by compelling obedience to a subpoena. But this Court holds the evidence inadmissible simply because the information leading to the issue of the subpoena has been unlawfully secured. *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. Literally, there is no "search" or "seizure" when a friendly visitor abstracts papers from an office; yet we held in *Gouled* v. *United States,* 255 U. S. 298, that evidence so obtained could not be used. No court which looked at the words of the Amendment rather than at its underlying purpose would hold, as this Court did in *Ex parte Jackson,* 96 U. S. 727, 733, that its protection extended to letters in the mails. The provision against self-incrimination in the Fifth Amendment has been given an equally broad construction. The language is: "No person . . . shall be compelled in any criminal case to be a witness against himself." Yet we have held, not only that the

protection of the Amendment extends to a witness before a grand jury, although he has not been charged with crime, *Counselman* v. *Hitchcock*, 142 U. S. 547, 562, 586. but that: " It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant." *McCarthy* v. *Arndstein*, 266 U. S. 34, 40. The narrow language of the Amendment has been consistently construed in the light of its object, "to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime. The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard." *Counselman* v. *Hitchcock, supra*, p. 562.

Decisions of this Court applying the principle of the *Boyd* case have settled these things. Unjustified search and seizure violates the Fourth Amendment, whatever the character of the paper;[4] whether the paper when taken by the federal officers was in the home,[5] in an office[6] or elsewhere;[7] whether the taking was effected by force,[8] by

[4] *Gouled* v. *United States*, 255 U. S. 298.

[5] *Weeks* v. *United States*, 232 U. S. 383; *Amos* v. *United States*, 255 U. S. 313; *Agnello* v. *United States*, 269 U. S. 20; *Byars* v. *United States*, 273 U. S. 28.

[6] *Boyd* v. *United States*, 116 U. S. 616; *Hale* v. *Henkel*, 201 U. S. 43, 70; *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385; *Gouled* v. *United States*, 255 U. S. 298; *Marron* v. *United States*, 275 U. S. 192.

[7] *Ex parte Jackson*, 96 U. S. 727, 733; *Carroll* v. *United States*, 267 U. S. 132, 156; *Gambino* v. *United States*, 275 U. S. 310.

[8] *Weeks* v. *United States*, 232 U. S. 383; *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385; *Amos* v. *United States*, 255 U. S. 313; *Carroll* v. *United States*, 267 U. S. 132, 156; *Agnello* v. *United States*, 269 U. S. 20; *Gambino* v. *United States*, 275 U. S. 310.

fraud,[9] or in the orderly process of a court's procedure.[10] From these decisions, it follows necessarily that the Amendment is violated by the officer's reading the paper without a physical seizure, without his even touching it; and that use, in any criminal proceeding, of the contents of the paper so examined—as where they are testified to by a federal officer who thus saw the document or where, through knowledge so obtained, a copy has been procured elsewhere [11]—any such use constitutes a violation of the Fifth Amendment.

The protection guaranteed by the Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence

---

[9] *Gouled* v. *United States,* 255 U. S. 298.

[10] *Boyd* v. *United States,* 116 U. S. 616; *Hale* v. *Henkel,* 201 U. S. 43, 70. See *Gouled* v. *United States,* 255 U. S. 298; *Byars* v. *United States,* 273 U S. 28; *Marron* v. *United States,* 275 U. S. 192.

[11] *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. Compare *Gouled* v. *United States,* 255 U. S. 298, 307. In *Stroud* v. *United States,* 251 U. S. 15, and *Hester* v. *United States,* 265 U. S. 57, the letter and articles admitted were not obtained by unlawful search and seizure. They were voluntary dislosures by the defendant. Compare *Smith* v. *United States,* 2 F. (2d) 715; *United States* v. *Lee,* 274 U. S. 559.

in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth.

Applying to the Fourth and Fifth Amendments the established rule of construction, the defendants' objections to the evidence obtained by wire-tapping must, in my opinion, be sustained. It is, of course, immaterial where the physical connection with the telephone wires leading into the defendants' premises was made. And it is also immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.[12]

Independently of the constitutional question, I am of opinion that the judgment should be reversed. By the laws of Washington, wire-tapping is a crime.[13] Pierce's

[12] The point is thus stated by counsel for the telephone companies, who have filed a brief as *amici curiae*: " Criminals will not escape detection and conviction merely because evidence obtained by tapping wires of a public telephone system is inadmissible, if it should be so held; but, in any event, it is better that a few criminals escape than that the privacies of life of all the people be exposed to .the agents of the government, who will act at their own discretion, the honest and the dishonest, unauthorized and unrestrained by the courts. Legislation making wire tapping a crime will not suffice if the courts nevertheless hold the evidence to be lawful."

[13] In the following states it is a criminal offense to intercept a message sent by telegraph and/or telephone: Alabama, Code, 1923, § 5256; Arizona, Revised Statutes, 1913, Penal Code, § 692; Arkansas, Crawford & Moses Digest, 1921, § 10246; California, Deering's Penal Code, 1927, § 640; Colorado, Compiled Laws, 1921, § 6969; Connecticut, General Statutes, 1918, § 6292; Idaho, Compiled Statutes, 1919, §§ 8574, 8586; Illinois, Revised Statutes, 1927, c. 134, § 21; Iowa, Code, 1927, § 13121; Kansas, Revised Statutes, 1923, c. 17, § 1908; Michigan, Compiled Laws, 1915, § 15403; Montana, Penal

480

Code, 1921, § 8976(18). To prove its case, the Government was obliged to lay bare the crimes committed by its· officers on its behalf. . A federal court should not permit such a prosecution to continue. Compare *Harkin* v. *Brundage*, 276 U. S. 36, *id.* 604. .

Code, 1921, § 11518; Nebraska, Compiled Statutes, 1922, § 7115; Nevada, Revised Laws, 1912, §§ 4608, 6572(18); New York, Consolidated Laws, c. 40, § 1423(6); North Dakota, Compiled Laws, 1913, § 10231; Ohio, Page's General Code, 1926, § 13402; Oklahoma, Session Laws, 1923, c. 46; Oregon, Olson's Laws, 1920, § 2265; South Dakota, Revised Code, 1919, § 4312; Tennessee, Shannon's Code, 1919, §§ 1839, 1840; Utah, Compiled Laws, 1917, § 8433;· Virginia, Code, 1924, § 4477(2), (3); Washington, Pierce's Code, 1921, § 8976(18); Wisconsin, Statutes, 1927, § 348.37; Wyoming, Compiled Statutes, 1920, § 7148. Compare *State* v. *Behringer*, 19 Ariz. 502; *State* v. *Nordskog*, 76 Wash. 472.

In the following states it is a criminal offense for a company engaged in the transmission of messages by telegraph and/or telephone, or its employees, or, in many instances, persons conniving with them, to disclose or to assist in the disclosure of any message: Alabama, Code, 1923, §§ 5543, 5545; Arizona, Revised Statutes, 1913, Penal Code, §§ 621, 623, 691; Arkansas, Crawford & Moses Digest, 1921, § 10250; California, Deering's Penal Code, 1927, §§ 619, 621, 639, 641; Colorado, Compiled Laws, 1921, §§ 6966, 6968, 6970; Connecticut, General Statutes, 1918, § 6292; Florida, Revised General Statutes, 1920, §§ 5754, 5755; Idaho, Compiled Statutes, 1919, §§ 8568, 8570; Illinois, Revised Statutes, 1927, c. 134, §§ 7, 7a; Indiana, Burns' Revised Statutes, 1926, § 2862; Iowa, Code, 1924, § 8305; Louisiana, Acts, 1918, c. 134, p. 228; Maine, Revised Statutes, 1916, c. 60, § 24; Maryland, Bagby's Code, 1926, § 489; Michigan, Compiled Statutes, 1915, § 15104; Minnesota, General Statutes, 1923, §§ 10423, 10424; Mississippi, Hemingway's Code, 1927, § 1174; Missouri, Revised Statutes, 1919, § 3605; Montana, Penal Code, 1921, § 11494; Nebraska, Compiled Statutes, 1922, § 7088; Nevada, Revised Laws, 1912, §§ 4603, 4605, 4609, 4631; New Jersey, Compiled Statutes, 1910, p. 5319; New York, Consolidated Laws, c. 40, §§ 552, 553; North Carolina, Consolidated Statutes, 1919, §§ 4497, 4498, 4499; North Dakota, Compiled Laws, 1913, § 10078; Ohio, Page's General Code, 1926, §§ 13388, 13419; Oklahoma, Session Laws, 1923, c. 46; Oregon, Olson's Laws, 1920, §§ 2260, 2262, 2266; Pennsylvania, Statutes, 1920, §§ 6306,

The situation in the case at bar differs widely from that presented in *Burdeau* v. *McDowell,* 256 U. S. 465. There, only a single lot of papers was involved. They had been obtained by a private detective while acting on behalf of a private party; without the knowledge of any federal official; long before anyone had thought of instituting a

6308, 6309; Rhode Island, General Laws, 1923, § 6104; South Dakota, Revised Code, 1919, §§ 4346, 9801; Tennessee, Shannon's Code, 1919, §§ 1837, 1838; Utah, Compiled Laws, 1917, §§ 8403, 8405, 8434; Washington, Pierce's Code, 1921, §§ 8982, 8983, Wisconsin, Statutes, 1927, § 348.36.

The Alaskan Penal Code, Act of March 3, 1899, c. 429, 30 Stat. 1253, 1278, provides that "if any officer, agent, operator, clerk, or employee of any telegraph company, or any other person, shall wilfully divulge to any other person than the party from whom the same was received, or to whom the same was addressed, or his agent or attorney, any message received or sent, or intended to be sent, over any telegraph line, or the contents, substance, purport, effect, or meaning of such message, or any part thereof, . . . the person so offending shall be deemed guilty of a misdemeanor, and shall be punished by a fine not to exceed one thousand dollars or imprisonment not to exceed one year, or by both such fine and imprisonment, in the discretion of the court."

The Act of October 29, 1918, c. 197, 40 Stat. 1017, provided: "That whoever during the period of governmental operation of the telephone and telegraph systems of the United States . . . shall, without authority and without the knowledge and consent of the other users thereof, except as may be necessary for operation of the service, tap any telegraph or telephone line, or wilfully interfere with the operation of such telephone and telegraph systems or with the transmission of any telephone or telegraph message, or with the delivery of any such message, or whoever being employed in any such telephone or telegraph service shall divulge the contents of any such telephone or telegraph message to any person not duly authorized to receive the same, shall be fined not exceeding $1,000 or imprisoned for not more than one year, or both."

The Radio Act, February 23, 1927, c. 169, § 27, 44 Stat. 1162, 1172, provides that "no person not being authorized by the sender shall intercept any message and divulge or publish the contents, substance, purport, effect, or meaning of such intercepted message to any person."

federal prosecution. Here, the evidence obtained by crime was obtained at the Government's expense, by its officers, while acting on its behalf; the officers who committed these crimes are the same officers who were charged with the enforcement of the Prohibition Act; the crimes of these officers were committed for the purpose of securing evidence with which to obtain an indictment and to secure a conviction. The evidence so obtained constitutes the warp and woof of the Government's case. The aggregate of the Government evidence occupies 306 pages of the printed record. More than 210 of them are filled by recitals of the details of the wire-tapping and of facts ascertained thereby.[14] There is literally no other evidence of guilt on the part of some of the defendants except that illegally obtained by these officers. As to nearly all the defendants (except those who admitted guilt), the evidence relied upon to secure a conviction consisted mainly of that which these officers had so obtained by violating the state law.

As Judge Rudkin said below: " Here we are concerned with neither eavesdroppers nor thieves. Nor are we concerned with the acts of private individuals. . . . We are concerned only with the acts of federal agents whose powers are limited and controlled by the Constitution of the United States." The Eighteenth Amendment has not in terms empowered Congress to authorize anyone to violate the criminal laws of a State. And Congress has never purported to do so. Compare *Maryland* v. *Soper*, 270 U. S. 9. The terms of appointment of federal prohibition agents do not purport to confer upon them authority to violate any criminal law. Their superior officer, the Secretary of the Treasury, has not instructed them to commit

---

[14] The above figures relate to Case No. 493. In Nos. 532–533, the Government evidence fills 278 pages, of which 140 are recitals of the evidence obtained by wire-tapping.

crime on behalf of the United States. It may be assumed that the Attorney General of the United States did not give any such instruction.[15]

When these unlawful acts were committed, they were crimes only of the officers individually. The Government was innocent, in legal contemplation; for no federal official is authorized to commit a crime on its behalf. When the Government, having full knowledge, sought, through the Department of Justice, to avail itself of the fruits of these acts in order to accomplish its own ends, it assumed moral responsibility for the officers' crimes. Compare *The Paquete Habana,* 189 U. S. 453, 465; *O'Reilly deCamara* v. *Brooke,* 209 U. S. 45, 52; *Dodge* v. *United States,* 272 U. S. 530, 532; *Gambino* v. *United States,* 275 U. S. 310. And if this Court should permit the Government, by means of its officers' crimes, to effect its purpose of punishing the defendants, there would seem to be present all the elements of a ratification. If so, the Government itself would become a lawbreaker.

Will this Court by sustaining the judgment below sanction such conduct on the part of the Executive? The governing principle has long been settled. It is that a court will not redress a wrong when he who invokes its aid has unclean hands.[16] The maxim of unclean hands comes

[15] According to the Government's brief, p. 41, " The Prohibition Unit of the Treasury disclaims it [wire-tapping] and the Department of Justice has frowned on it." See also " Prohibition Enforcement," 69th Congress, 2d Session, Senate Doc. No. 198, pp. iv, v, 13, 15, referred to Committee, January 25, 1927; also Same, Part 2.

[16] See *Hannay* v. *Eve,* 3 Cranch, 242, 247; *Bank of the United States* v. *Owens,* 2 Pet. 527, 538; *Bartle* v. *Coleman,* 4 Pet. 184, 188; *Kennett* v. *Chambers,* 14 How. 38, 52; *Marshall* v. *Baltimore & Ohio R. R. Co.,* 16 How. 314, 334; *Tool Co.* v. *Norris,* 2 Wall 45, 54; *The Ouachita Cotton,* 6 Wall. 521, 532; *Coppell* v. *Hall,* 7 Wall. 542; *Forsyth* v. *Woods,* 11 Wall. 484, 486; *Hanauer* v. *Doane,* 12 Wall. 342, 349; *Trist* v. *Child,* 21 Wall. 441, 448; *Meguire* v. *Corwine,* 101 U. S. 108, 111; *Oscanyan* v. *Arms Co.,* 103 U. S. 261; *Irwin* v. *Williar,* 110

· from courts of equity.[17] But the principle prevails also in courts of law. Its common application is in civil actions between private parties. Where the Government is the actor, the reasons for applying it are even more persuasive. Where the remedies invoked are those of the criminal law, the reasons are compelling.[18]

The door of a court is not barred because the plaintiff has committed a crime. The confirmed criminal is as much entitled to redress as his most virtuous fellow citizen; no record of crime, however long, makes one an outlaw. The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress.[19] Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. The rule is one, not of action, but of inaction. It is sometimes

U. S. 499, 510; *Woodstock Iron Co.* v. *Richmond & Danville Extension Co.,* 129 U. S. 643; *Gibbs* v. *Consolidated Gas Co.,* 130 U. S. 396, 411; *Embrey* v. *Jemison,* 131 U. S. 336, 348; *West* v. *Camden,* 135 U. S. 507, 521; *McMullen* v. *Hoffman,* 174 U. S. 639, 654; *Hazelton* v. *Sheckells,* 202 U. S. 71; *Crocker* v. *United States,* 240 U. S. 74, 78. Compare *Holman* v. *Johnson,* 1 Cowp. 341.

[17] See *Creath's Administrator* v. *Sims,* 5 How. 192, 204; *Kennett* v. *Chambers,* 14 How. 38, 49; *Randall* v. *Howard,* 2 Black, 585, 586; *Wheeler* v. *Sage,* 1 Wall. 518, 530; *Dent* v. *Ferguson,* 132 U. S. 50, 64; *Pope Manufacturing Co.* v. *Gormully,* 144 U. S. 224, 236; *Miller* v. *Ammon,* 145 U. S. 421, 425; *Hazelton* v. *Sheckells,* 202 U. S. 71, 79. Compare *International News Service* v. *Associated Press,* 248 U. S. 215, 245.

[18] Compare *State* v. *Simmons,* 39 Kan. 262, 264–265; *State* v. *Miller,* 44 Mo. App. 159, 163–164; *In re Robinson,* 29 Neb. 135; *Harris* v. *State,* 15 Tex. App. 629, 634–635, 639.

[19] See *Armstrong* v. *Toler,* 11 Wheat. 258; *Brooks* v. *Martin,* 2 Wall. 70; *Planters' Bank* v. *Union Bank,* 16 Wall. 483, 499–500; *Houston & Texas Central R. R. Co.* v. *Texas,* 177 U. S. 66, 99; *Bothwell* v. *Buckbee, Mears Co.,* 275 U. S. 274.

spoken of as a rule of substantive law. But it extends to matters of procedure as well.[20] A defense may be waived. It is waived when not pleaded. But the objection that the plaintiff comes with unclean hands will be taken by the court itself.[21] It will be taken despite the wish to the contrary of all the parties to the litigation. The court protects itself.

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law 'the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

Mr. Justice Butler, dissenting.

I sincerely regret that I cannot support the opinion and judgments of the Court in these cases.

---

[20] See *Lutton* v. *Benin*, 11 Mod. 50; *Barlow* v. *Hall*, 2 Anst. 461; *Wells* v. *Gurney*, 8 Barn. & Cress. 769; *Ilsley* v. *Nichols*, 12 Pick. 270; *Carpenter* v. *Spooner*, 2 Sandf. 717; *Metcalf* v. *Clark*, 41 Barb. 45; *Williams* ads. *Reed*, 29 N. J. L. 385; *Hill* v. *Goodrich*, 32 Conn. 588; *Townsend* v. *Smith*, 47 Wis. 623; *Blandin* v. *Ostrander*, 239 Fed. 700; *Harkin* v. *Brundage*, 276 U. S. 36, *id.*, 604.

[21] *Coppell* v. *Hall*, 7 Wall. 542, 558; *Oscanyan* v. *Arms Co.*, 103 U. S. 261, 267; *Higgins* v. *McCrea*, 116 U. S. 671, 685. Compare *Evans* v. *Richardson*, 3 Mer. 469; *Norman* v. *Cole*, 3 Esp. 253; *Northwestern Salt Co.* v. *Electrolytic Alkali Co.*, [1913] 3 K. B. 422.

The order allowing the writs of certiorari operated to limit arguments of counsel to the constitutional question. I do not participate in the controversy that has arisen here as to whether the evidence was inadmissible because the mode of obtaining it was unethical and a misdemeanor under state law. I prefer to say nothing concerning those questions because they are not within the jurisdiction taken by the order.

The Court is required to construe the provision of the Fourth Amendment that declares: " The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." The Fifth Amendment prevents the use of evidence obtained through searches and seizures in violation of the rights of the accused protected by the Fourth Amendment.

The single question for consideration is this: May the Government, consistently with that clause, have its officers whenever they see fit, tap wires, listen to, take down and report, the private messages and conversations transmitted by telephones?

The United States maintains that " The ' wire tapping ' operations of the federal prohibition agents were not a ' search and seizure ' in violation of the security of the ' persons, houses, papers and effects ' of the petitioners in the constitutional sense or within the intendment of the Fourth Amendment." The Court, adhering to and reiterating the principles laid down and applied in prior decisions * construing the search and seizure clause, in substance adopts the contention of the Government.

The question at issue depends upon a just appreciation of the facts.

---

* *Ex parte Jackson,* 96 U. S. 727. *Boyd* v. *United States,* 116 U. S. 616. *Weeks* v. *United States,* 232 U. S. 383. *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. *Gouled* v. *United States,* 255 U. S. 298. *Amos* v. *United States,* 255 U. S. 313.

Telephones are used generally for transmission of messages concerning official, social, business and personal affairs including communications that are private and privileged—those between physician and patient, lawyer and client, parent and child, husband and wife. The contracts between telephone companies and users contemplate the private use of the facilities employed in the service. The communications belong to the parties between whom they pass. During their transmission the exclusive use of the wire belongs to the persons served by it. Wire tapping involves interference with the wire while being used. Tapping the wires and listening in by the officers literally constituted a search for evidence. As the communications passed, they were heard and taken down.

In *Boyd* v. *United States,* 116 U. S. 616, there was no " search or seizure " within the literal or ordinary meaning of the words, nor was Boyd—if these constitutional provisions were read strictly according to the letter—compelled in a " criminal case " to be a " witness " against himself. The statute, there held unconstitutional because repugnant to the search and seizure clause, merely authorized judgment for sums claimed by the Government on account of revenue if the defendant failed to produce his books, invoices and papers. The principle of that case has been followed, developed and applied in this and many other courts. And it is in harmony with the rule of liberal construction that always has been applied to provisions of the Constitution safeguarding personal rights (*Byars* v. *United States,* 273 U. S. 28, 32), as well as to those granting governmental powers. *McCulloch* v. *Maryland,* 4 Wheat. 316, 404, 406, 407, 421. *Marbury* v. *Madison,* 1 Cranch 137, 153, 176. *Cohens* v. *Virginia,* 6 Wheat. 264. *Myers* v. *United States,* 272 U. S. 52.

This Court has always construed the Constitution in the light of the principles upon which it was founded.

The direct operation or literal meaning of the words used do not measure the purpose or scope of its provisions. Under the principles established and applied by this Court, the Fourth Amendment safeguards against all evils that are like and equivalent to those embraced within the ordinary meaning of its words. That construction is consonant with sound reason and in full accord with the course of decisions since *McCulloch* v. *Maryland*. That is the principle directly applied in the *Boyd* case.

When the facts in these cases are truly estimated, a fair application of that principle decides the constitutional question in favor of the petitioners. With great deference, I think they should be given a new trial.

MR. JUSTICE STONE, dissenting.

I concur in the opinions of MR. JUSTICE HOLMES and MR. JUSTICE BRANDEIS. I agree also with that of MR. JUSTICE BUTLER so far as it deals with the merits. The effect of the order granting certiorari was to limit the argument to a single question, but I do not understand that it restrains the Court from a consideration of any question which we find to be presented by the record, for, under Jud. Code, § 240(a), this Court determines a case here on certiorari " with the same power and authority, and with like effect, as if the cause had been brought [here] by unrestricted writ of error or appeal."