No. 12707

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

THE STATE OF MONTANA,

Plaintiff and Appellant,

vs.

DONALD LEROY COBURN,

Defendant and Respondent.

---

Appeal from: District Court of the First Judicial District,
Honorable Peter G. Meloy, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
J. C. Weingartner, Assistant Attorney General,
argued, Helena, Montana
Leif B. Erickson argued, Deputy County Attorney,
Helena, Montana

For Respondent:

Smith, Smith and Sewell, Helena, Montana
Robert J. Sewell argued, Helena, Montana

For Amicus Curiae:

Rae Kalbfleisch, Shelby, Montana
Thomas Honzel, Helena, Montana

---

Submitted: June 12, 1974
Decided: DEC 30 1974

Filed: DEC 30 1974

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

The state appeals from an order of the district court, Lewis and Clark County, on January 23, 1974, to suppress evidence, i.e. marijuana. The evidence was seized by Robert Hillis, manager of McDonald's Restaurant, from a coat belonging to defendant hanging in the manager's office of the restaurant located in Helena, Montana.

The Montana County Attorneys Association filed a motion with this Court for leave to appear, file a brief, and make oral argument amicus curiae. Its motion was granted.

Defendant Donald Leroy Coburn was employed as an assistant manager at McDonald's Restaurant located in Helena. His supervisor was the manager, Robert Hillis. While at home between 4:00 and 6:00 p.m., on November 29, 1973, Hillis received a phone call from Jason Keller, another assistant manager of McDonald's, alerting him that defendant had some marijuana on the restaurant's premises. Hillis then called the owner of the store in Billings to inform him of the problem and ask his advice.

Following his conversation with the owner, Hillis went directly to the Helena police department and spoke with one Sgt. Sanguine. The transcript shows this examination of Hillis:

> "Q. As closely as possible, would you tell the Court what you said to the officer? A. Okay, I went down and I told him who I was and I told him that there was marijuana in the store and that I didn't want to get the store involved, you know, any more than necessary, and we talked about whether it was legal for him to go get it, and he said that he couldn't for some legal reason and we talked about whether I should, and he didn't know whether that was legal or not for sure and he called somebody and talked to them, I don't remember who it was and I don't remember whether we ever came to a definite decision as to whether I should get it or forget it or what, and I wasn't going to leave it in the store, I couldn't have it in the store because if the other kids, if any of them knew about it, because if one can do it they might all do it."

On cross-examination, Hillis testified:

- 2 -

"Q. I am trying to get some idea, you know, of what your frame of mind was when you left the police department. A. Well, I would have gotten it out of there one way or the other, if the police wouldn't I would have gotten it out myself.

" * * *

"Q. Now, you have testified that you had some conversation with the officer about whether or not you should remove this package? A. Right.

"Q. And you also testified that you don't remember what conclusion was reached? A. No.

"Q. Well, could you say whether or not you had the feeling when you left the police department that you should do it? A. I had the feeling I was going to, I knew I was going to."

On redirect:

"Q. On this last topic you stated that at the police station or thereafter you went back with the idea of removing the marijuana. Had you formed that idea prior to going to the police station, the general concept that the marijuana should be removed from the premises? A. Yes, before I even went to the police station, definitely.

"Q. So, it wasn't as a result of your conversation at the police station that you decided to remove the marijuana? A. No, absolutely not."

On recross:

"Q. And if the police had taken steps or had told you they would take steps, then I presume you wouldn't have taken any action to remove it? A. Right."

On cross-examination Sgt. Sanguine testified:

"Q. Did he ask for any advice as to what to do? A. Well, he didn't want to, he didn't want the police to enter the premises because of the possibility of bad publicity for the company, but he just wanted us to know he was going to go down there.

"Q. Okay, and what did you do, what did you respond to that? A. Well, I advised him that under the circumstances that if he didn't want us to enter into it, he would be mainly on his own as to how he wanted to handle it.

" * * *

"Q. Could you tell us, well, is there anything do you remember any parting words when he left the police station? A. When he left, he was still

- 3 -

undecided about how he was going to handle it
and I did advise him if he wanted us to that
we could wait until Mr. Coburn got off duty and
we would confront him down off the premises.

"Q.  Did you feel you had, based on your exper-
ience as a police sergeant, did you feel that
you had sufficient cause at that time to attempt
to seize the substance?  A.  I feel that if he
could allow us to enter the premises, we could
have."

On recross:

"Q.  I take it that when he came in and told you
these problems and the fact that he didn't want
his company involved, that there ensued a dis-
cussion about a seizure of these packages by
himself, and rather than a seizure of the packages
by you, is that true?  A.  Well, I didn't advise
him to do it that way.

"Q.  That's right, I understand that, but what I
want to know is what was said about him doing it.
A.  Well, I don't believe at the time he really
didn't know what he was going to do, I can't say
there was too much discussion on him removing it.

"Q.  Did  you expect him when he came back with the
stuff?  A.  No, I didn't really, I didn't think he
would come back." (Emphasis supplied).

Following his conversation with Sgt. Sanguine, Hillis left
the police station and went to the restaurant; upon arriving
there, he entered the manager's office.  This office was a private
office to which only the manager and assistant managers had un-
limited access.  Hillis then saw defendant's coat hanging on the
wall.  He could see a bulge in the hip pocket.  He removed the
substance, later determined to be marijuana, from defendant's
coat without a search warrant or without express or implied con-
sent from defendant.  Hillis then returned to the police station
and turned the marijuana over to the police.

In its order suppressing this evidence the district court
said in part:

"It is the opinion of this Court that the rule
adopted by the Montana Supreme Court in the
Brecht case applies in the case at bar, therefore,
it is

"ORDERED that the motion to suppress the evidence

- 4 -

obtained by the search be and the same is hereby granted." (Emphasis added).

There is but one issue presented by the state in this appeal: Did the district court err in suppressing the evidence seized by Robert Hillis, relying on this Court's decision in State v. Brecht, 157 Mont. 264, 270, 485 P.2d 47 (1971)?

This case is unique in that the state and amicus curiae attack only the Brecht decision. They ask that it be reversed and confine their arguments in that regard only to the application of the Fourth Amendment to the United States Constitution, ignoring any other considerations. This would indicate that Brecht, as written, is not clear and an explanation is warranted even though the instant case can be distinguished.

In Brecht the defendant was charged with the murder of his estranged wife. Her death resulted from the discharge of a shotgun under disputed circumstances in the tavern where she was employed on the evening of May 17, 1967. Deceased and her sister Sandra resided with their mother at the mother's home for a period of time before the shooting. The sister Sandra received a call at the mother's home from the defendant on the evening of April 29, 1967, some two weeks prior to the shooting incident; he asked to speak with his wife and Sandra called her to the telephone. Without the consent of either party, Sandra proceeded to listen to the conversation on an extension telephone in another room. At trial Sandra was permitted to relate the conversation which she alleged contained this threat by defendant "I got my shotgun out of hock, I am coming down and I will use it if I have to".

In Brecht the state agreed that had this intrusion and the conversation overheard been obtained by an agent of the state it would have been excluded by the court because of the ruling in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L ed 2d 576 (1967). Katz is a electronic surveillance case and the landmark case that overturned the longstanding doctrine that search and

- 5 -

seizure under the Fourth Amendment was unreasonable only if an intrusion or trespass accompanied the seizure of "tangible goods" i.e., indicating a property right or enclave theory. Katz held these rights to be personal and protective of people and not simply areas with no physical intrusion required. Brecht excluded the conversation of Sandra Brumfield based on violation of defendant's right of privacy established in Welsh v. Roehm, 125 Mont. 517, 241 P.2d 816, a court declared constitutional right; the Fourth and Fifth Amendments of the United States Constitution; Art. III, Sec. 7 of the 1889 Montana Constitution; and stated in pertinent part:

> " * * * The violation of the constitutional right to privacy and against compulsory self-incrimination is as detrimental to the person to whom the protection is guaranteed in the one case as in the other. To distinguish between classes of violators is tantamount to destruction of the right itself. * * *

> " * * *

> "This Court in the present case would be remiss were it not to recognize that evidence obtained by the unlawful or unreasonable invasion of several of the constitutionally protected rights guaranteed to its citizens by both the federal and Montana constitutions properly comes within the contemplation of this Court's exclusionary rule. To do otherwise would lend Court approval to a fictional distinction between classes of citizens: those who are bound to respect the Constitution and those who are not. Were the exclusionary rule to recognize such distinctions it would by indirection circumvent the rule established by this Court to enforce these rights and would in fact render the rule and the constitutional guarantees it protects meaningless."

The state and amicus curiae proceed in argument on the premise that Brecht rested solely on the Fourth Amendment and present a deluge of Fourth Amendment cases which establish this general rule, contained in 68 Am Jur 2d, Searches and Seizures §13, p. 670:

> "It is no part of the policy underlying the Fourth Amendment to discourage citizens from

aiding to the utmost of their ability in the apprehension of criminals. Accordingly, it has long been recognized that the Fourth Amendment's protections against unreasonable search and seizure do not extend to a search or seizure made by a private individual, conducted without police participation. In support of this rule, it has been said that the origin and history of the Fourth Amendment clearly show that it was intended only as a restraint upon the activities of sovereign authority, and that a contrary ruling would have no deterrent effect since private persons would be unaware of the rule * * *". (Emphasis added).

The general rule and cited cases are based on the holding of the United States Supreme Court in Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L ed 1048 (1921).

The state and amicus argue that Brecht was improvident and against the weight of authority. A careful reading of Brecht reveals that this is an oversimplification of the problem. As heretofore stated Brecht rested only in part on the Fourth Amendment and it would appear that any attempt to reverse Brecht would necessarily require a treatment of additional constitutional considerations upon which the Brecht decision rests and, further, a consideration of the legal issues raised by defendant here. Defendant contends the search violated these constitutional and statutory provisions:

Article II, Sec. 10, 1972 Montana Constitution:

"Right of Privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

Section 95-701, R.C.M. 1947:

"Searches and seizures--when authorized. A search of a person, object or place may be made and instruments, articles or things may be seized in accordance with the provisions of this chapter when the search is made:

"(a) As an incident to a lawful arrest.

"(b) With the consent of the accused or of any other person who is lawfully in possession of the object or place to be searched, or who is believed upon reasonable cause to be in such lawful possession by the person making the search.

- 7 -

"(c) By the authority of a valid search warrant.

"(d) Under the authority and within the scope of a right of lawful inspection granted by law."

Defendant's contentions raise some interesting problems when considered with the fact that Montana has a statute, section 95-611, R.C.M. 1947, which provides:

"95-611. Arrest by a private person. A private person may arrest another when:

"(1) he believes, on reasonable grounds, that an offense is being committed or attempted in his presence;

"(2) a felony has in fact been committed and he believes, on reasonable grounds, that the person arrested has committed it * * *".

Also, the federal constitution contains no specific section establishing a separate and independent right of privacy as does the 1972 Montana Constitution. The United States Constitution recognizes the right as part of the First, Third, Fourth and Fifth Amendments. Katz v. United States, supra.

The state in oral argument cited a Montana Law Review note at 34 Montana Law Review 187, which it advised the Court also represented the state's view as an in depth discussion of Brecht and the exclusionary rule.

The totality of the state, amicus and law review article arguments reduce themselves to:

(1) The exclusionary rule is not a completely satisfactory rule and represents an attempt to solve a problem that defies simple solution. The conflicting policy considerations are the interest of society in criminal prosecutions and the prohibiting of law enforcement personnel from violating Fourth Amendment proscriptions, a proscription extended to right of privacy as well. The intent of the rule was to remove the incentive for officers to violate the rule and deter official misconduct and promote "judicial integrity". Logic would dictate

- 8 -

that to fulfill the function of the rule the <u>person violating the rule must have an interest in obtaining the conviction and must at least be aware of the rule</u>.

(2) They adopt the strict construction doctrine of the general rule that the authors of the Fourth Amendment, fearing an oppressive sovereign, meant only to give limited protection from government action. The United States Supreme Court in Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L ed 1048, said:

> "The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of <u>sovereign authority, and was not intended to be a limitation upon other than governmental agencies</u>; as against such authority it was the purpose of the <u>Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property subject to the right of seizure by process duly issued</u>." (Emphasis added).

A fair analysis of the arguments would seem to imply that the position of the parties was much the same as that expressed by Chief Justice Taft, writing for the majority in a five-four decision, Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L ed 944, 954, (1928), a telephone intrusion case by federal officers, where he held the Fourth Amendment not subject to application beyond the intent of the framers of the amendment and its words could not be stretched to be given a meaning to include "intangible" and trespass was a requirement to invade the protected property.

All parties in the instant case have avoided any analysis of <u>Katz</u> in which, Justice Black in his dissenting opinion proclaims that the majority in <u>Katz</u> have "rewritten the Fourth Amendment". Justice Black in his dissent also relied heavily on <u>Olmstead</u>.

It would appear then that the arguments based on strict

interpretation, origin, history, and intent of the authors as they concern the Fourth Amendment are highly diluted since Katz in 1967. The majority in Katz recognize that the former decisions of the Court foreclosed Fourth Amendment inquiry when penetration or trespass was absent, citing Olmstead and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L ed 1322, for the Amendment was thought to limit only searches and seizures of tangible property and property rights controlled. The majority, in Katz, cited Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L ed 2d 734, as the departure from that narrow view and included intangibles as well. It went on to hold that the Fourth Amendment protects people and not simply "areas" and therefore the reach of the Fourth Amendment cannot turn upon the presence or absence of physical intrusion into any given enclosure, and the trespass doctrine in Olmstead and Goldman can no longer be controlling.

This then demonstrates a radical departure from the accepted meaning of the words of the Fourth Amendment which controlled for over a period of 40 or more years, since Olmstead. It further demonstrates that these traditional concepts are not static. This is not a new concept by any means. In Olmstead, many years ago, among the four dissenting justices, Brandies observed in reference to interpretation on the same subject as Katz:

> "Clauses guaranteeing to the individual protection
> against specific abuses of power, must have a
> similar capacity of adaptation to a changing
> world. It was with reference to such a clause
> that this court said, in Weems v. United States,
> 217 U.S. 349, 373, 54 L ed 793, 801, 30 Sup.Ct.
> Rep. 544: 'Legislation, both statutory and con-
> stitutional, is enacted, it is true, from an ex-
> perience of evils, but its general language should
> not, therefore, be necessarily confined to the form
> that evil had theretofore taken. Time works changes,
> brings into existence new conditions and purposes.
> Therefore a principle to be vital must be capable

of wider application than the mischief which gave
it birth. This is peculiarly true of constitutions.
They are not ephemeral enactments, designed to meet
passing occasions. They are, to use the words of
Chief Justice Marshall, "designed to approach
immortality as nearly as human institutions can
approach it." The future is their care and pro-
vision for events of good and bad tendencies of
which no prophecy can be made. In the application
of a constitution, therefore, our contemplation
cannot be only of what has been but of what may
be. Under any other rule a constitution would
indeed be as easy of application as it would be
deficient in efficacy and power. Its general
principles would have little value and be converted
by precedent into lifeless and impotent formulas.
Rights declared in words might be lost in reality.'"
(Emphasis added).

So far as privacy is concerned, Katz recognized the Fourth

Amendment was not a general right of privacy but the right was

contained in the Fourth and several other amendments, the First,

Third and the Fifth, and as stated in Katz at p. 581, 19 L ed 2d,

in reference to the right of privacy:

" * * * his right to be let alone by other people--
is, like the protection of his property and of
his very life, left largely to the law of the indi-
vidual States."

In Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524,

29 L ed 746, (1886), the Court noted that the Fourth and Fifth

Amendments were very closely tied and the unreasonable search and

seizure of the Fourth Amendment almost always compels a man to

give evidence against himself which is condemned in the Fifth

Amendment. In this regard the Fourth and Fifth Amendments almost

run into each other. This adds to the problem the fact that a

violation of the Fifth Amendment rights, whether private or

government, is condemned in all courts, military and civil. Haynes

v. Washington, 373 U.S. 503,

83 S.Ct. 1336, 10 L ed 2d 513, (1963); Rogers v. Richmond, 365

U.S. 534, 81 S.Ct. 735, 5 L ed 2d 760, (1961); Payne v. Arkansas,

356 U.S. 560, 78 S.Ct. 844, 2 L ed 2d 975, (1958).

Concerning the exclusionary rule itself, it would be well

to consider first that the "exclusionary rule" is a court adopted rule resting on the "rule making" and "supervisory power" of the Supreme Court over the other courts and has no roots in the constitution or the statutes of the state or federal government. (Dissent in Katz by Justice Black and citing Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L ed 1782; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L ed 2d 1081, 84 ALR2d 933; Elkins v. U.S., 364 U.S. 206, 80 S.Ct. 1437, 4 L ed 2d 1669, 1677, 1680, 1681, (1960).)

The fact that the rule is characterized as not satisfactory and the state in argument recommended that a tort remedy for the aggrieved was adequate, simply ignores that all of the cases which declare the rule as a deterrent because the wrong cannot be corrected or compensated, but merely avoided in the future, must have recognized that there could be no price placed on a constitutional right.

The court in People v. Cahan, 44 Cal.2d 434, 282 P.2d 905, (1955), observed that the court was compelled to apply the rule because all remedies, such as criminal and tort, had completely failed to secure these rights under the Constitution. Cahan was cited and approved in Elkins with a long discussion on the problem, citing statements from the chief law enforcement officers of California and the FBI in support of the rule.

In Elkins, the court said:

> "The exclusionary rule has for decades been the subject of ardent controversy. The arguments of its antagonists and of its proponents have been so many times marshalled as to require no lengthy elaboration here."

It is, however, noteworthy to comment on its application and the "silver platter doctrine" that resulted. The first application of the rule, in 1914, applied only to the federal court system and only excluded tainted evidence obtained by

federal officers and as a result the so-called "silver platter doctrine" was developed, i.e., state officers could violate a person's constitutional right and hand the evidence to the federal officers [on a silver platter] and such evidence could be used in the federal court because no federal officer was physically involved in the violation.

This practice was recognized but ignored for over 40 years until Elkins. In that case, the "silver platter doctrine" was finally discredited. Elkins went on to observe that it is unlikely factual data could be assembled to demonstrate that the exclusionary rule was unworkable and in some depth demonstrated the opposite conclusion. Of more interest, Elkins cites with approval as a ground for rejecting the so-called "silver platter doctrine":

> "But there is another consideration--the imperative of judicial integrity. It was of this that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in Olmstead v. United States, 277 U.S. 438, at 469, 471, 72 L ed 944, 952, 953, 48 S.Ct. 564, 66 ALR 376, more than 30 years ago. 'For those who agree with me,' said Mr. Justice Holmes, 'no distinction can be taken between the Government as prosecutor and the Government as judge.' 277 US at 470. (Dissenting opinion.) 'In a government of laws,' said Mr. Justice Brandeis, 'existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means--to declare that the Government may commit crimes in order to secure the conviction of a private criminal--would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.' 277 U.S. at 485. (Dissenting opinion.)"

Elkins also cites McNabb v. United States, 318 U.S. 332, 345, 63 S.Ct. 608, 87 L ed 819, in support of this doctrine and then concludes:

"Even less should the federal courts be accomplices in the willful disobedience of a Constitution they are sworn to uphold."

Of course, this would apply to all of the court systems.

In Mapp, shortly after Elkins, the last door was closed and the exclusionary rule was applied to the state courts. The rule may have many of the deficiencies that are contended by the state, but a close examination of its history would seem to present a strong case that once the rule was formulated the un-explained, uneven and ignoble application by the judiciary lent no strength to the rule and it is certainly no compliment to judicial integrity to admit to the inordinate length of time that the "silver platter doctrine" was ignored.

Incidental to this matter the state commented with em-phasis in its brief, that State v. Gardner, 77 Mont. 8, 249 P. 574 (1926),was not considered in Brecht but was by implication overruled by Brecht. The Supreme Court of Montana had adopted its own exclusionary rule at that time, long prior to Mapp, and did quote from Burdeau, the foundation case, for the general rule quoted in Gardner. However, Gardner involved the "silver platter doctrine" in the use of illegally obtained evidence by the federal authorities in a state court and used Burdeau to justify this action in an entirely different context than that under consideration in Brecht. It would seem fair to assume that Elkins overruled, not Brecht.

The argument that the exclusionary rule is wedded to the sovereign because the organized officialdom are the only ones that can be deterred because the injury to the victim cannot be restored or reparation comes too late, and that all others would have no prosecution motive and could not be familiar with the rule is an unwarranted generalization that completely disregards the changes that have taken place in our political and social

- 14 -

structure and the legal impact of the cases on the subject since the rule was announced in Burdeau in 1921; with particular reference to Katz and Elkins. It also follows that no consideration is being given to the cases cited, including Brecht, where there is a merger of the Fourth and Fifth Amendments in a violation of a personal right, particularly when authority cited by the state agrees that Fifth Amendment violations are excluded when done by a private person. No thought is given to the Montana Constitution or statutes previously cited. Finally, it fails altogether to recognize the massive increase in the incidents of the invasions of the right of privacy of the private citizen or the scientific advances that have made this possible, even though the United States Congress has finally recognized the problem and has given it priority consideration.

Further, the arguments erroneously characterize the "private person" as the little old lady next door who has a desire to assist in law enforcement. When in fact a great many of the pure Fourth Amendment cases cited by the state involve "institutional", "quasi" or "private" police, i.e., airport guards, building security personnel, private detectives and we also have private corporation police like railroad police and self-help groups and investigators for political committees. Experience simply does not cast these groups of "private" persons in the minority. The standards agreed to by the state simply do not fit this segment of the private sector. Methods designed to protect the multiple rights of the whole of our citizenry are not intended to free criminals or discourage the participation of citizens in the enforcement of our laws.

If one considers that any exclusionary process only excludes "unreasonable" conduct it can readily be seen that all intrusions are not unreasonable. Like it or not unreasonable or

illegal intrusions knowingly accepted and used, from the private sector by the government amount to an extension of the silver platter doctrine condemned by Elkins, particularly when viewed in the light of judicial integrity emphasized in Elkins. It has been argued that Elkins did not disturb Burdeau, it may not have been clear in the pure Fourth Amendment context, but a close examination does move one to believe that the silver platter concept was condemned in any context.

This Court, however, does recognize the multitude of problems that arise and have arisen over the decades in an attempted solution of this very difficult problem and a final solution may well require that recognition be given to the wide disparity in terms of knowledge, motive and awareness of the widely diverse groups, institutions and individuals sought to be controlled and collusion avoided by the exclusionary rule.

If personal rights are to be protected and governmental integrity preserved the answer does not lie in ignoring the problem, as did the federal system for so many years, but a possible examination of the rigidity of the rule itself might be in order. The solution could very well be partially achieved by an examination of standards for reasonableness in these matters applicable to government on the one hand, institutional police and private persons as we move down in this diverse process. This is much the same problem to be faced under a statutory "private" arrest, when it involves a search and seizure incident thereto.

The Court is mindful that by respondent's brief and case analysis there have been constitutional and statutory questions raised that bear directly on this problem which we have not answered. Under the facts and circumstances of this case, we feel that we should not and therefore have not done so.

As stated at the beginning of this opinion, the instant

- 16 -

case can be distinguished from <u>Brecht</u>. It might be well to establish that it is distinguished on legal grounds. The Court does not call into question the good faith or integrity nor offer criticism of any of the parties here involved, for whatever personal reasons controlled the decisions made that night.

The testimony clearly reveals two outstanding departures from the doctrine urged by state and amicus.

(1) The transcript quoted reveals the reporting of a crime to the proper authority, with abundant probable cause for arrest procedure. At this point a crime against the state, not McDonalds, was involved. The public interest thereafter was subordinated to that of a private interest when the store manager was permitted the luxury of self-help. No matter how laudable the motives, there is no proof that adverse publicity would have been any greater had the matter been handled by the police. There is no legal difference if the crime reported had been a deceased person by unnatural means. After the manager obtained the drug it was promptly turned over to the police. This then is not the example used in argument of an innocent assist to the government with no conviction motive, or why else the initial report and the delivering of the evidence for prosecution.

(2) The conference with officials beforehand defeats, at least impliedly, the ignorance of the rule concept. Further the state endorsed in its cited law review article, 34 Montana Law Review 187, 197, while explaining private cooperation with the police creates less of a problem than might be imagined, that:

> " * * * As soon as a private individual acts in
> association or cooperation with the police, the
> courts have held that his act is deemed to be
> the act of the state. [Miramontes v. Superior
> Court for County of San Mateo, 25 Cal.App.3rd 877,
> 102 Cal. Rptr. 182 (1972).] Not only will evidence
> be excluded if a private individual works at the
> direction or supervision of the police, but it
> will also be excluded when the police are guilty

of no more than just 'idly standing by'".

Stapleton v. Superior Court of L.A. County, 70 Cal.2d 97, 447
P.2d 967, 970 (1969); State ex rel. Sadler v. District Court,
70 Mont. 378, 225 P. 1000 (1924).

Admittedly the facts of the case presented by the state
through the law review article are much stronger than ours.
However Stapleton does hold:

> " * * * the police need not have requested or dir-
> ected the search in order to be guilty of 'standing
> idly by'; knowledge of the illegal search coupled
> with a failure to protect the [defendant's] rights
> against such a search suffices."

The legal impact drawn from all of the facts seems to
come much more under Stapleton than Brecht, however, in either
case the district court was not in error.

The judgment of the district court is affirmed.

```
_____
                    Justice
```

We concur:

```
_____

_____

_____
    Justices

_____
```

Hon. M. James Sorte, District
Judge, sitting in place of Mr. Chief
Justice James T. Harrison.

Mr. Justice Wesley Castles dissenting:

I dissent.

I would squarely overrule State v. Brecht, 157 Mont. 264, 485 P.2d 47.

In Brecht, defendant was charged with murder in the first degree. Sandra Brumfield, sister of the deceased, was allowed to testify to a telephone conversation between defendant and the deceased. Both Sandra and the deceased were, at that time, residing in the home of their mother. During the telephone conversation, Sandra picked up an extension telephone and listened to the conversation. She was allowed to testify at the trial that she heard the defendant tell the deceased, "I got my shotgun out of hock, I am coming down and I will use it if I have to." This Court held that the admission of this testimony violated the defendant's Fourth and Fourteenth Amendment rights and his rights under Article III, Sec. 7, of the 1889 Montana Constitution. In so holding, this Court stated at pages 270, 271, that the exclusionary rule applied to searches and seizures conducted by private individuals:

> "The violation of the constitutional right to privacy and against compulsory self-incrimination is as detrimental to the person to whom the protection is guaranteed in the one case as in the other. To distinguish between classes of violators is tantamount to destruction of the right itself.
>
> " * * *
>
> "This Court in the present case would be remiss were it not to recognize that evidence obtained by the unlawful or unreasonable invasion of several of the constitutionally protected rights guaranteed to its citizens by both the federal and Montana constitutions properly comes within the contemplation of this Court's exclusionary rule. To do otherwise would lend Court approval to a fictional distinction between classes of citizens: those who are bound to respect the Constitution and those who are not. Were the exclusionary rule to recognize such distinctions it would by indirection circumvent the rule

- 19 -

established by this Court to enforce these rights and would in fact render the rule and the constitutional guarantees it protects meaningless."

Leaving aside for the moment issues relating to the Montana Constitution, the plain and simple truth is that a seizure by a private individual does not violate the federal Constitution so long as that individual cannot be deemed an agent of the state because of his involvement with the police.

In the case of Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L ed 1048 (1921), the defendant's employer had entered defendant's office, drilled his safe and broken the locks on his desk. A few months later, the employer turned the papers found over to the government. In response to a motion asking for an order for the return of the books, papers, memoranda, correspondence, and other data in the possession of the Special Assistant to the Attorney General of the United States, the Court stated:

"The 4th Amendment gives protection against unlawful searches and seizures, and, as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the 4th Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.

"In the present case the record clearly shows that no official of the Federal government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him and was in the possession of the Cities Service Company. It is manifest that there was no invasion of the security afforded by the 4th Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another."

Although the scope of the exclusionary rule has expanded immensely since the decision in Burdeau in 1921, that decision

- 20 -

has not been deviated from by the courts of this country.  The United States Supreme Court in Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L ed 1782 (1949), held that the Fourth Amendment's search and seizure prohibitions were applicable to the states under the due process clause of the Fourteenth Amendment.  Its decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1081, 6 L ed 2d 1684 (1961), by holding that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court", made the exclusionary rule applicable to the states.  However, in order to invoke the exclusionary rule on federal constitutional grounds there must have been, as a condition precedent, some violation of the federal constitution.  Mapp, supra.  A search and seizure by a private individual does not violate the Fourth Amendment.  Burdeau, supra.  Likewise, as the Fourteenth Amendment is directed to the states and not to private individuals, a search and seizure by a private individual does not violate the Fourteenth Amendment.  Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L ed 2d 564 (1971).  Thus, because a search and seizure by a private individual does not violate the federal constitution, it follows that the exclusionary rule is not mandated by the federal constitution.

Here, the events transpiring at the police station show there was no involvement by the police in this search and seizure nor was Hillis an instrumentality of the police.  I cannot accept the proposition that a person becomes an instrumentality of the police merely by reporting an incident to the police.  On the other hand, the police cannot use a person who reports a crime as an unwitting tool of the police to achieve ends forbidden to the police themselves.  Such is not the case here.  There is absolutely no evidence to indicate that the police consciously played dumb or refused to make the search and seizure for the

purpose of encouraging a search and seizure by a private individual.

The fact the police did not actively enter into the incident by prohibiting Hillis from making the search and seizure or by obtaining a search warrant and making the search and seizure themselves should not result in Hillis being deemed an instrumentality of the police and suppression of the evidence. It is not the policy of this state to inhibit the reporting of crime to the police. One of the motives of Hillis throughout this incident was to protect the reputation of McDonald's by preventing bad publicity which might ensue if uniformed police were to make the search and seizure on the premises. The police knew this. If the business community is aware that a report to the police must result in an immediate police response without regard for the consequences or its effect on its business' good-will, there is no doubt in our minds that the reporting of incidents to the police will be inhibited and lessened. Thus, I would decline to hold that Hillis was an instrumentality of the police for purposes of the instant search and seizure.

Defendant contends the search and seizure of the substance by Robert Hillis from defendant's coat pocket violated Article II, Sections 10 and 11, of the 1972 Montana Constitution and section 95-701, R.C.M. 1947, and thus must be suppressed by reason of the exclusionary rule. Those sections read as follows:

> "Section 10. Right of Privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

> "Section 11. Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing."

"95-701. Searches and seizures--when authorized.
A search of a person, object or place may be
made and instruments, articles or things may be
seized in accordance with the provisions of this
chapter when the search is made:

"(a) As an incident to a lawful arrest.

"(b) With the consent of the accused or of any
other person who is lawfully in possession of
the object or place to be searched, or who is
believed upon reasonable cause to be in such
lawful possession by the person making the
search.

"(c) By the authority of a valid search warrant.

"(d) Under the authority and within the scope of
a right of lawful inspection granted by law."

Even if the search and seizure by Hillis was a violation
of the foregoing provisions, the facts of this case do not
warrant an application of the exclusionary rule.

In discussing the purpose of the exclusionary rule, the
Supreme Court of the United States has recently stated in United
States v. Calandra, _____U.S._____, 94 S.Ct.____, 38 L ed 2d 561,
571 (1974):

"The purpose of the exclusionary rule is not to
redress the injury to the privacy of the search
victim:

"'[T]he ruptured privacy of the victims' homes
and effects cannot be restored. Reparation
comes too late.' Linkletter v. Walker, 381 U.S.
618, 637, 14 L ed 2d 601, 85 S.Ct. 1731 (1965).

"Instead, the rule's prime purpose is to deter future
unlawful police conduct and thereby effectuate the
guarantee of the Fourth Amendment against unreason-
able search and seizures:

"'The rule is calculated to prevent, not to repair.
Its purpose is to deter--to compel respect for the
constitutional guaranty in the only effectively
available way--by removing the incentive to dis-
regard it.' Elkins v. United States, 364 U.S.
206, 217, 4 L ed 2d 1669, 80 S.Ct. 1437 (1960).

"Accord, Mapp v. Ohio, 367 U.S. 643, 656, 6 L ed 2d
1081, 81 S.Ct. 1684, 84 ALR2d 933 (1961); Tehan v.
United States, ex rel. Shot, 382 U.S. 406, 416,
15 L ed 2d 453, 86 S.Ct. 459 (1966); Terry v. Ohio,
392 U.S. 1, 29, 20 L ed 2d 889, 88 S.Ct. 1868 (1968).
In sum, the rule is a judicially-created remedy

- 23 -

designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.

"Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally-seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served."

In declining to extend the exclusionary rule to the use in grand jury proceedings of evidence seized in violation of the Fourth Amendment, the Court in <u>Calandra</u> stated, at page 573 of 38 L ed 2d:

"Against this potential damage to the role and functions of the grand jury, we must weigh the benefits to be derived from this proposed extension of the exclusionary rule. Suppression of the use of illegally-seized evidence against the search victim in a criminal trial is thought to be an important method of effectuating the Fourth Amendment. But it does not follow that the Fourth Amendment requires adoption of every proposal that might deter police misconduct. In Alderman v. United States, 394 U.S., at 174, 22 L ed 2d 176, for example, this Court declined to extend the exclusionary rule to one who was not the victim of the unlawful search:

"'The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.'

"We think this observation equally applicable in the present context.

"Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best. Whatever deterrence of police misconduct may result from the exclusion of illegally-seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal. Such

- 24 -

an extension would deter only police investi-
gation consciously directed toward the dis-
covery of evidence solely for use in a grand
jury investigation.  The incentive to disregard
the requirement of the Fourth Amendment solely
to obtain an indictment from a grand jury is sub-
stantially negated by the inadmissibility of the
illegally-seized evidence in a subsequent crim-
inal prosecution of the search victim.  For the
most part, a prosecutor would be unlikely to
request an indictment where a conviction could
not be obtained.  We therefore decline to em-
brace a view that would achieve a speculative
and undoubtedly minimal advance in the deterrence
of police misconduct at the expense of substan-
tially impeding the role of the grand jury."

From the foregoing excerpts from Calandra, it can be

readily seen that the purpose of the exclusionary rule is to

deter future unlawful official conduct and not as a bonus to

the criminal defendant whose rights have been violated.  Where

there has been no unlawful official misconduct, as in the

present factual situation, the reason for the rule fails.  Even

if it be conceded that the reason for the exclusionary rule is

to deter all illegal conduct, official or private, the appli-

cation of the rule has been restricted to those areas where its

remedial objectives are thought most efficaciously served.

Calandra, supra.  Thus, whether the exclusionary rule will be

applied in any given case comes down to a balancing test: whether

the rule's value as a deterrent to misconduct outweighs the

public interest in preventing and prosecuting crime.

As stated in the Note at 34 Montana Law Review 187, 195-

196:

"Logic indicates that certain requirements must
be met if the rule is in fact going to fulfill
its deterrent function.  For one thing, the per-
son committing the search and seizure must have
an interest in obtaining a conviction with the
information he secures.  Obviously the rule is
of no value where, for example, the police have
'no interest in prosecuting, or are willing to
forego successful prosecution in the interest
of serving another goal.' * * *

"The other requirement, which on the surface seems

- 25 -

> elemental, is that the person involved in the
> search and seizure must at least be aware of
> the rule. While it is not unusual to expect
> the police to be familiar with certain salient
> rules of evidence, it does seem unlikely that
> a layman with no interest or intent of securing
> the conviction of criminals would have much know-
> ledge in this area."

The testimony set forth at the beginning of the majority opinion shows that Hillis had two motives for removing the substance from defendant's pocket, neither of which was to prosecute or convict defendant: (1) He wanted to remove the substance so that the other employees would not get the feeling that they could with impunity possess drugs on the McDonald's premises; (2) he desired to keep the police from getting involved in order to protect the reputation of McDonald's. Whether or not the desire to keep the police from getting involved was proper, Hillis was not motivated to secure a conviction of defendant. Neither is there any evidence of Hillis' awareness of the exclusionary rule.

Even if it had been established that Hillis had been motivated to secure a conviction or had known of the exclusionary rule, the application of that rule in the case of a search and seizure by a private individual, as here, would not be appropriate. The function of the exclusionary rule is to deter, not to repair. Despite the motivation or knowledge of the exclusionary rule in the present case, the Court is bound to look at what effect an application in this case would have on _future_ cases of search and seizure by private individuals. We believe it would be a rare case where a private individual conducting an illegal search and seizure would have both the motivation to convict and an awareness of the exclusionary rule. Thus, the deterrent effect of imposing the exclusionary rule in this case would be speculative at best. Such speculative value is here outweighed by the public interest in preventing and prosecuting crime. When the

- 26 -

reason of a rule ceases, so should the rule itself. Section 49-102, R.C.M. 1947.

It is difficult to determine just what the legal basis is for the majority opinion other than a love for the exclusionary rule. Heretofore I have attempted to show that Hillis was not in any manner an instrumentality of the police and in no sense was the proverbial "silver platter doctrine" involved here. Moreover, the majority opinion states that when Hillis reported to the police there was "abundant probable cause for arrest procedure"! Surely the majority does not mean that. Compare the holding on probable cause for an arrest here with that in State v. Thorsness, ____Mont.____, ____P.2d____, 31 St.Rep. 895, written by Justice Haswell and concurred in by Justice Daly.

Thereafter the majority approves the statement in Stapleton v. Superior Court of L. A. County, 70 Cal.2d 97, 447 P.2d 967, 970, that:

> "Not only will evidence be excluded if a private individual works at the direction or supervision of the police, but it will be also excluded when the police are guilty of no more than 'just idly standing by'."

In my view this is an unwise extension of the exclusionary rule.

_____
Justice

Mr. Justice John Conway Harrison concurring in Justice Castles' dissent:

Although I did not participate in Brecht I join Justice Castles in his dissent here and would overrule Brecht. No other jurisdiction that I can find has extended the "silver platter" doctrine to include all that Brecht covers. In my opinion the net effect of Brecht further hamstrings law enforcement officials.

_____
Justice

- 27 -